No. 21-35582

# In the United States Court of Appeals for the Ninth Circuit

**ROBERT A. STANARD,**
*Petitioner-Appellant,*

*v.*

**MARIA DY, *et al.*,**
*Respondents-Appellees.*

*ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON*

**PETITIONER-APPELLANT'S OPENING BRIEF**

SAMUEL WEISS
OREN NIMNI
RIGHTS BEHIND BARS
  *416 Florida Avenue NW
  Suite 26152
  Washington, DC 20001*

XIAO WANG
MATTHEW DICKEL*
TAYLOR HOFFMAN*
ELISABETH LOGAN*
BRIANA SINGSON*
NORTHWESTERN UNIVERSITY
PRITZKER SCHOOL OF LAW
APPELLATE ADVOCACY CENTER,
BLUHM LEGAL CLINIC
  *375 E. Chicago Avenue, 8th Floor
  Chicago, IL 60611
  x.wang@law.northwestern.edu*

* Law student; appearing on brief pursuant to Circuit Rule 46-4.

## CORPORATE DISCLOSURE STATEMENT

Rights Behind Bars is a corporation exempt from income tax under 26 U.S.C. § 501(c)(3).  Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Rights Behind Bars makes the following disclosures:

1)  Rights Behind Bars has no parent corporation.

2)  Rights Behind Bars is not owned in any part by any publicly held corporation.

Respectfully submitted,

/s/ Xiao Wang
XIAO WANG

*Counsel for Petitioner-Appellant*

DATED:    JANUARY 18, 2022

# TABLE OF CONTENTS

Page

Corporate disclosure statement..............................................................i

Table of authorities.............................................................................iv

Introduction.........................................................................................1

Statement of jurisdiction.....................................................................3

Statement of the issues .......................................................................4

Statement of the case ..........................................................................5

    A.    Factual background. ...............................................................5

    B.    Legal framework....................................................................11

Summary of argument .......................................................................15

Standard of review.............................................................................25

Argument............................................................................................26

I.    The district court erred in finding that Mr. Stanard's Eighth
Amendment claim presented a new *Bivens* context. ...........................26

    A.    Mr. Stanard's Eighth Amendment claim arises in the same
context as *Carlson v. Green.* .........................................26

    B.    *Abbasi* confirms that *Carlson* and this case are
substantially similar...........................................................29

II.    Mr. Stanard's Eighth Amendment claim is, at most, a modest
extension of *Carlson*...................................................................41

    A.    There are no adequate alternative remedies. ...............................41

    B.    Mr. Stanard has stated a plausible claim for relief.......................52

III.    The district court erred in finding that Mr. Stanard's Fifth
Amendment claim presented a new *Bivens* context. ...........................53

    A.    *Carlson* involved a Fifth Amendment claim. ...............................55

    B.    *Davis* involved a Fifth Amendment claim....................................58

C.      The *Abbasi* factors establish that this case falls well within
        the contours of *Carlson* and *Davis*. ..................................................59

IV.   Even if Mr. Stanard's Fifth Amendment claim arises in a new
        *Bivens* context, it constitutes a well-supported extension of
        *Carlson* and *Davis*......................................................................................62

Conclusion.........................................................................................................65

Statement of related cases and proceedings ......................................................67

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andrews v. Cervantes,*
  493 F.3d 1047 (9th Cir. 2007) .................................................. 38

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .......................................................... 25, 52

*Atkins v. Parker,*
  972 F.3d 734 (6th Cir. 2020) ................................................. 38

*Bell v. Wolfish,*
  441 U.S. 520 (1979) .............................................................. 12

*Berry v. City of Muskogee,*
  900 F.2d 1489 (10th Cir. 1990) ............................................. 60

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
  403 U.S. 388 (1971) .......................................................*passim*

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ........................................................... 2, 54

*Broughton v. Cutter Laboratories,*
  622 F.2d 458 (9th Cir. 1980) ................................................. 38

*Brown v. Wolf,*
  705 F. App'x 63 (3d Cir. 2017) ............................................. 38

*Butz v. Economou,*
  438 U.S. 478 (1978) .............................................................. 19

*Carlson v. Green,*
  446 U.S. 14 (1980) ..........................................................*passim*

*City of Revere v. Massachusetts General Hospital,*
  463 U.S. 239 (1983) .......................................................... 25, 61

*Clement v. Gomez,*
  298 F.3d 898 (9th Cir. 2002) ................................................. 53

# CASES (CONT'D)

*Colwell v. Bannister,*
  763 F.3d 1060 (9th Cir. 2014) ................................................... 38

*Correctional Services Corporation v. Malesko,*
  534 U.S. 61 (2001) .................................................................... 50

*Davis v. Passman,*
  442 U.S. 228 (1979) ............................................................*passim*

*Desertrain v. City of Los Angeles,*
  754 F.3d 1147 (9th Cir. 2014) ............................................ 36, 37

*Dilley v. Gunn,*
  64 F.3d 1365 (9th Cir. 1995) ............................................. 20, 43

*Eminence Capital, LLC v. Aspeon, Inc.,*
  316 F.3d 1048 (9th Cir. 2003) ................................................. 36

*Erickson v. Pardus,*
  551 U.S. 89 (2007) (per curiam) ....................................25, 35, 36

*Estelle v. Gamble,*
  429 U.S. 97 (1976) .............................................................*passim*

*FDIC v. Meyer,*
  510 U.S. 471 (1994) .................................................................. 51

*Frost v. Agnos,*
  152 F.3d 1124 (9th Cir. 1998) ................................................. 61

*Gilead Sciences, Inc. v. Merck & Co., Inc.,*
  2016 WL 3143943 (N.D. Cal. June 6, 2016) ............................... 6

*Gillespie v. Civiletti,*
  629 F.2d 637 (9th Cir. 1980) ..............................................*passim*

*Green v. Carlson,*
  581 F.2d 669 (7th Cir. 1978) ..............................................*passim*

*Harger v. Department of Labor,*
  569 F.3d 898 (9th Cir. 2009) ................................................... 48

*Hebbe v. Pliler,*
  627 F.3d 338 (9th Cir. 2010) ................................................... 25

# CASES (CONT'D)

*Helling v. McKinney*,
  509 U.S. 25 (1993) ............................................................................... 18

*Henson v. Corizon Health LLC*,
  2021 WL 4222008 (D. Ariz. Sept. 16, 2021) ...................................... 7

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020) .................................................................*passim*

*Hudson v. McMillian*,
  503 U.S. 1 (1992) ................................................................................. 53

*Ingraham v. Wright*,
  430 U.S. 651 (1977) ..................................................................... 12, 60

*Ioane v. Hodges*,
  939 F.3d 945 (9th Cir. 2018) ...................................................... 18, 37

*Jacobs v. Alam*,
  915 F.3d 1028 (6th Cir. 2019) .................................................... 18, 21

*Jacobson v. Tahoe Regional Planning Agency*,
  566 F.2d 1353 (9th Cir. 1977) .................................................... 55, 58

*Koprowski v. Baker*,
  822 F.3d 248 (6th Cir. 2016) ...................................................... 28, 40

*Lanuza v. Love*,
  899 F.3d 1019 (9th Cir. 2018) ...............................................19, 39, 40

*Marceau v. Blackfeet Housing Authority*,
  540 F.3d 916 (9th Cir. 2008) ............................................................ 48

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ........................................................................... 44

*McRae v. Dikran*,
  776 F. App'x 412 (9th Cir. 2019) ..................................................... 28

*Mitchell v. Nobles*,
  873 F.3d 869 (11th Cir. 2017) .......................................................... 38

*Nunez v. Duncan*,
  591 F.3d 1217 (9th Cir. 2010) ...................................................*passim*

# CASES (CONT'D)

*Orr v. Shicker,*
   953 F.3d 490 (7th Cir. 2020) ........................................................ 38

*Oregon Advocacy Center v. Mink,*
   322 F.3d 1101 (9th Cir. 2003) ...................................................... 61

*Ortiz v. Webster,*
   655 F.3d 731 (7th Cir. 2011) .................................................. 21, 28

*Osborn v. Haley,*
   549 U.S. 225 (2006) ...................................................................... 46

*Palm v. Los Angeles Department of Water & Power,*
   889 F.3d 1081 (9th Cir. 2018) ...................................................... 25

*Pimental-Estrada v. Barr,*
   458 F. Supp. 3d 1226 (W.D. Wash. 2020) ...................................... 5

*Porter v. Nussle,*
   534 U.S. 516 (2002) .................................................................. 21, 45

*Postawko v. Missouri Department of Corrections,*
   910 F.3d 1030 (8th Cir. 2018) ...................................................... 43

*Preiser v. Newkirk,*
   422 U.S. 395 (1975) ...................................................................... 43

*Quintana v. Santa Fe County Board of Commissioners,*
   973 F.3d 1022 (10th Cir. 2020) ................................................ 52, 53

*Rasberry v. Garcia,*
   448 F.3d 1150 (9th Cir. 2006) ...................................................... 25

*Redman v. County of San Diego,*
   942 F.2d 1435 (9th Cir. 1991) ...................................................... 61

*Reid v. United States,*
   825 F. App'x 442 (9th Cir. 2020) ..........................................*passim*

*Resnick v. Hayes,*
   213 F.3d 443 (9th Cir. 2000) ........................................................ 60

*Robinson v. Sherrod,*
   631 F.3d 839 (7th Cir. 2011) .................................................. 47, 48

# CASES (CONT'D)

*Rodriguez v. Swartz,*
  899 F.3d 719 (9th Cir. 2018) ........................................................... 13

*Ross v. Williams,*
  950 F.3d 1160 (9th Cir. 2020) ......................................................... 36

*Roy v. Barr,*
  960 F.3d 1175 (9th Cir. 2020) ................................................... 60, 61

*Sessions v. Morales-Santana,*
  137 S. Ct. 1678 (2017) .................................................................... 54

*Swartz v. Rodriguez,*
  140 S. Ct. 1258 (2020) .................................................................... 13

*United States ex rel. Lee v. SmithKline Beecham, Inc.,*
  245 F.3d 1048 (9th Cir. 2001) ......................................................... 37

*United States v. Avendano-Camacho,*
  786 F.2d 1392 (9th Cir. 1986) ......................................................... 61

*United States v. Sahhar,*
  917 F.2d 1197 (9th Cir. 1990) ......................................................... 61

*United States v. Wilson,*
  631 F.2d 118 (9th Cir. 1980) ............................................................. 5

*Whitnack v. Douglas County,*
  16 F.3d 954 (8th Cir. 1994) ............................................................. 60

*Wisk Aero LLC v. Archer Aviation Inc.,*
  2021 WL 4073760 (N.D. Cal. Aug. 24, 2021) .................................. 52

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ............................................................*passim*

# RULES

Fed. R. App. P. 4(a)(1)(B) ..................................................................... 3

## STATUTES

5 U.S.C. § 551(13) ........................................................................ 47

5 U.S.C. § 553(b)(3)(A) ............................................................... 47

5 U.S.C. § 702 .............................................................................. 48

5 U.S.C. § 704 .............................................................................. 47

28 U.S.C. § 1291 ............................................................................ 3

28 U.S.C. § 1331 ............................................................................ 3

28 U.S.C. § 2679 .......................................................................... 46

42 U.S.C. § 1983 .................................................................... 40, 44

42 U.S.C. § 1997e ........................................................................ 44

## OTHER AUTHORITIES

Br. for Resp., *Carlson v. Green*,
    446 U.S. 14 (1980), 1979 WL 213534 ................................. 56

Cert. Br., *Carlson v. Green*,
    446 U.S. 14 (1980), 1979 WL 213535 ................................. 56

Civil Pro Se Forms, Complaint for Violation of Civil Rights (Prisoner), U.S.
    COURTS (effective Dec. 1, 2016) ....................................... 40

Fed. Bureau of Prisons, Clinical Guidance: Evaluation and Management of
    Chronic Hepatitis C Virus (HCV) Infection (January 2018) ..............*passim*

Fed. Bureau of Prisons, Clinical Guidance: Evaluation and Management of
    Chronic Hepatitis C Virus (HCV) Infection (March 2021) ................... 50, 51

*Hepatitis C Liver Damage Progression,* HEPATITIS C TRUST ..................... 33

James E. Pfander, Alexander A. Reinert, & Joanna C. Schwartz, *The Myth
    of Personal Liability: Who Pays When* Bivens *Claims Succeed*,
    72 STAN. L. REV. 561 (2020) ............................................ 50

Nicholas J. Burstow, et al., *Hepatitis C Treatment: Where Are We Now?*,
    10 INT'L J. OF GEN. MED. 39 (2017) ..................................... 6

*Quick Facts: Felon in Possession of a Firearm*, U.S. Sᴇɴᴛᴇɴᴄɪɴɢ Cᴏᴍᴍ'ɴ
  (2019) ................................................................................................. 7

Reply Br. for Pet'rs, *Carlson v. Green*
  446 U.S. 14 (1980), 1980 WL 371715 ........................................*passim*

Robert S. Brown, Jr., *The Possible Association Between DAA Treatment for*
  *HCV Infection and HCC Recurrence*,
  12 Gᴀsᴛʀᴏᴇɴᴛᴇʀᴏʟᴏɢʏ & Hᴇᴘᴀᴛᴏʟᴏɢʏ 776 (2016) ...................................... 6

S. Rep. 93-588 (1973) .......................................................................... 45

**INTRODUCTION**

Robert Stanard has been afflicted with Hepatitis C virus ("HCV") for more than a decade. After his conviction for a federal crime in 2018, his illness took a turn for the worse. While detained at FDC SeaTac, he experienced significant pain, "bloating," an "[in]ab[ility] to eat," and "difficulty swallowing." ER-137. These conditions motivated Mr. Stanard to seek medical treatment, and he filed at least six separate formal requests seeking HCV antiviral medication while at SeaTac.

Each time, these pleas fell on deaf ears. Sometimes Defendants declined to give Mr. Stanard care because they insisted, notwithstanding his visible, outward symptoms, that his lab test levels were "not within the required range to receive treatment." ER-127. In other instances, Defendants refused treatment because Mr. Stanard was deemed a pretrial inmate—even though he had already been tried and convicted by the time he sought treatment. *Id.*

At the end of 2018, Mr. Stanard was transferred from FDC SeaTac to FCI Sheridan. ER-135. After his transfer, Sheridan officials conducted an individualized assessment into Mr. Stanard's medical condition—in other words, *exactly* what federal law and policy requires and what those at SeaTac did *not* do—and subsequently prescribed antiviral treatment. Less than six

weeks after Mr. Stanard started therapy, HCV was no longer detected in his body.    ER-137.

To be clear:  Mr. Stanard could have been treated and cured of his HCV multiple times over had just *one* Defendant taken seriously their legal responsibility to provide him adequate, patient-specific medical care.  He instead experienced "fatigue, [b]loating in the abdominal area [and] swelling of [the] liver" for months.  ER-133.  These circumstances—needless pain and suffering in a federal prison, in contravention of law and policy—give rise to two separate constitutional claims for damages.

*First*, the Eighth Amendment bars federal prison officials from acting with "deliberate[] indifferen[ce] to" an inmate's "serious medical needs." *Carlson v. Green*, 446 U.S. 14, 16 n.1 (1980).  That right has been established for decades.  And Mr. Stanard's months-long saga of physical and mental distress reflects the very sort of claim *Carlson* and its progeny were meant to protect.

*Second*, the Fifth Amendment's due process clause incorporates the "concept[] of equal protection."  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  At the least, this promise of equal protection requires officials to offer *some* basis for treating a convicted but not yet sentenced inmate differently from someone serving their sentence.  No such basis was offered here—not for

treating such individuals differently as a general matter, nor for (mis)classifying Mr. Stanard's status as a specific means for denying him medical care.

To seek restitution for the violation of his rights, Mr. Stanard filed an action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). That is what he should have done. After all, "*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court." *Carlson*, 446 U.S. at 18. Moreover, Mr. Stanard's claims fall well within one of the most well-recognized grounds for *Bivens* relief: a federal prisoner seeking to remedy harm endured because of a failure to receive adequate medical care. The district court's finding otherwise, and resultant dismissal of Mr. Stanard's complaint, was unwarranted and should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Mr. Stanard's claims pursuant to 28 U.S.C. § 1331. On July 1, 2021, the district court granted Defendants' motion to dismiss and dismissed the case with prejudice. ER-4. Mr. Stanard timely filed a notice of appeal on July 19, 2021. ER-206; *see* Fed. R. App. P. 4(a)(1)(B). This court has jurisdiction over the district court's final judgment dismissing Mr. Stanard's complaint pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1. Whether the district court erred by finding that Mr. Stanard's Eighth Amendment claim, based on Defendants' deliberate indifference to his medical care, presented a different *Bivens* context than that in *Carlson v. Green*, 446 U.S. 14 (1980).

2. Whether, assuming Mr. Stanard's Eighth Amendment claim constitutes a new *Bivens* context, the district court erred by declining to recognize a modest extension of *Carlson*, where there are no alternative remedies available and no special factors counseling otherwise.

3. Whether the district court erred by finding that Mr. Stanard's Fifth Amendment claim, based on Defendants' violation of the equal protection component of that amendment, presented a context different from that of *Carlson* and *Davis v. Passman*, 442 U.S. 228 (1979).

4. Whether, assuming Mr. Stanard's Fifth Amendment claim constitutes a new *Bivens* context, the district court erred by declining to recognize a modest extension of *Carlson* and *Davis*, where there are no alternative remedies available and no special factors counseling otherwise.

## STATEMENT OF THE CASE

**A.     Factual background.**

**1.     Mr. Stanard's HCV history and his detention at FDC SeaTac.**

Robert Stanard contracted HCV during a prior incarceration at a Bureau of Prisons ("BOP") facility.  ER-119.  He was diagnosed in July 2009 following a liver biopsy, and released a year later.  ER-128–29, ER-140–41.

In November 2016, Mr. Stanard was arrested for felon in possession of a firearm.  R. 4, *United States v. Stanard*, No. 2:16-CR-00320 (W.D. Wash. Nov. 10, 2016).[1]  After an initial appearance, *id.* at R. 3, he was detained at FDC SeaTac pending trial.  He was subsequently convicted on January 11, 2018, and remained at SeaTac awaiting sentencing and eventual transfer to an FCI facility.  *Id.* at R. 118 (Jan. 11, 2018).

Mr. Stanard's HCV became markedly worse while at SeaTac, with "[p]ain caused from liver inflamation [sic], causing [him] . . . bloating, and [an] [inability] to eat from [the] liver pushing on [his] stomach."  ER-137.  Around the same time, a fellow inmate, Michael Doughty, "rapidly deteriorate[d]" from HCV.  ER-131.  Mr. Doughty endured "agonising [sic] pain" over several

---

[1] A court may take "judicial notice of records in other cases." *Pimental-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1238 n.7 (W.D. Wash. 2020) (citing *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980)).

months and ultimately died from HCV complications. ER-132. That experience "caused" Mr. Stanard "psychological" distress, which he expressed to a psychologist. *Id.*

### 2. Defendants Dy and McDermont deny HCV treatment.

When Mr. Stanard first contracted HCV, there were few effective treatments. Most involved a combination of interferon and ribavirin; these treatments cured HCV in only 40% of cases, and often with severe side effects. *Gilead Scis., Inc. v. Merck & Co., Inc.*, 2016 WL 3143943, at *4 (N.D. Cal. June 6, 2016). But in the early 2010s, the FDA began approving a series of novel antiviral treatments, known as direct-acting antivirals or DAAs.

DAAs represent a significant advance in HCV care. Studies show that they cure HCV in over 95% of cases, with few side effects.[2] Given Mr. Stanard's worsening symptoms and, following his conviction, faced with the prospect of a multi-year incarceration ahead of him[3]—Mr. Stanard began seeking DAA treatment in earnest in early 2018.

---

[2] *See, e.g.*, Nicholas J. Burstow, et al., *Hepatitis C Treatment: Where Are We Now?*, 10 INT'L J. OF GEN. MED. 39, 46 (2017); Robert S. Brown, Jr., *The Possible Association Between DAA Treatment for HCV Infection and HCC Recurrence*, 12 GASTROENTEROLOGY & HEPATOLOGY 776, 776 (2016).

[3] The average sentence for felon in possession of a firearm is 64 months. *Quick Facts: Felon in Possession of a Firearm*, U.S. SENTENCING COMM'N

Mr. Stanard met first with Defendant Maria Dy, a medical doctor at SeaTac. ER-127 ("I spoke to Dr. Dy at least 7 times regarding my serious and chronic disease."). She denied him DAAs. *Id.* Defendant Dy reported that Mr. Stanard was "not qualified for Hep. C. treatment at this time based on the lab test result on 1/2/18. Your APRI went down from 2.51 to 0.41." ER-70; *see Henson v. Corizon Health LLC*, 2021 WL 4222008, at *8 (D. Ariz. Sept. 16, 2021) ("[T]he APRI score is [a] method for non-invasive assessment of hepatic fibrosis and cirrhosis and APRI scores greater than 2.0 may be used to predict the presence of cirrhosis.") (internal quotation marks omitted).

Mr. Stanard likewise spoke to Louise McDermont, SeaTac's Health Services Administrator. ER-127. Defendant McDermont repeated Defendant Dy's rationale—that Mr. Stanard's "APRI Levels are not within the required range to receive treatment," ER-127—and added that he would "not be able to get *any* treatment while you are here because . . . you are a pre-trial inmate," *id.* (emphasis added).

---

(2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY19.pdf. The district court sentenced Mr. Stanard to 84 months. R. 154, *United States v. Stanard*, No. 16-CR-00320 (W.D. Wash. July 13, 2018).

### 3.  Mr. Stanard exhausts the inmate grievance process.

After receiving these denials, Mr. Stanard filed on March 2, 2018 an in-formal resolution form, known as a BP-8.  ER-130.  This is the "first step" in the inmate grievance process.  *See Nunez v. Duncan*, 591 F.3d 1217, 1219 (9th Cir. 2010).  "If the informal complaint does not resolve the dispute, the inmate may make an 'Administrative Remedy Request' concerning the dispute to the prison Warden using a BP–9 form." *Id.*

Mr. Stanard never received a response to this first BP-8, despite multiple follow-up requests.  ER-130.  By early April, his counselor gave him a new BP-8 to fill out, a seeming acknowledgment that the initial BP-8 had gone miss-ing. *Id.*  Mr. Stanard completed a second BP-8 on April 4, 2018. *Id.*  He waited another month.  Again he heard nothing.  Believing his efforts through the BP-8 had not "resolve[d] the dispute," *Nunez*, 591 F.3d at 1219, Mr. Stanard sub-mitted a BP-9 to Dan Sproul, SeaTac's warden. ER-130.

On May 13, 2018, Mr. Stanard received a rejection notice for his second BP-8 and for his first BP-9.  ER-130–31.  His first BP-9 was rejected because it had been filed without "having the BP-8 attached to it."  ER-131.  Mr. Sta-nard subsequently submitted another BP-9, this time attaching his rejected BP-8. *Id.*

8

Defendant Sproul responded to Mr. Stanard's second BP-9 on May 22, 2018. *Id.* The response stated that Mr. Stanard was "currently a treatment priority level 3" based on his APRI scores, as well as a "pre-trial inmate"; the "Federal Bureau of Prisons is currently focusing on treating priority level one and two level inmates." *Id.* Over the phone, Warden Sproul stated that BOP was "not required to give treatment to *any* pre-trial inmate." ER-127 (emphasis added). Rather than receive DAAs, Mr. Stanard would "continue to be monitored closely by Health Services." ER-131.

Mr. Stanard disagreed with Warden Sproul's assessment. He had "made very clear the problems or issues that [he] deal[t] with on a regular basis," including "fatigue, [b]loating in the abdominal area [and] swelling of [his] liver," which were not necessarily evident from his APRI scores alone. ER-133. In addition, he "was no longer a pre-trial inmate but had been convicted at trial and [was] past [pre-trial] status." *Id.* He thus filed on May 30, 2018 a BP-10, to Juan Baltazar, the Western Regional Medical Director. ER-132; *see also Nunez*, 591 F.3d at 1219 ("If the Warden renders an adverse decision on the BP–9, the inmate may appeal to the Regional Director using a BP–10 form."). Mr. Stanard did not receive a response to this BP-10 for several months. On October 7, 2018, he filed a BP-11 with the Central Office of

National Inmate Appeals. ER-133; *Nunez*, 591 F.3d at 1219–20 (discussing BP-11 as final step in grievance process).

While awaiting a response to his BP-10 and BP-11, Mr. Stanard was physically transferred, from FDC SeaTac to FCI Sheridan. ER-135. Mr. Stanard continued to request treatment after his transfer. A Sheridan official approved Mr. Stanard for DAAs in late 2018, and by April 2019, HCV was no longer detected in Mr. Stanard's body. ER-137.

While his treatment was pending, Mr. Stanard finally received answers to his BP-10 and BP-11. On November 13, 2018, Ian Connors, Administrator of National Inmate Appeals, rejected Mr. Stanard's BP-11. ER-133. In explaining the basis of this rejection, Defendant Connors "relied on [the] July 22, 2009 [] liver biopsy that [Mr. Stanard] showed a stage zero (0) fibrosis." ER-134. Defendant Connors did not discuss more recent reports as to Mr. Stanard's condition. *Id.* Mr. Stanard's BP-10 was rejected by Defendant Baltazar on December 6, 2018. ER-133. This rejection stated that "non-sentenced inmates . . . are ineligible" for HCV treatment. ER-128.

**B.      Legal framework.**

**1.      The complaint and motion to dismiss.**

On August 30, 2019, Mr. Stanard filed suit in the United States District Court for the Western District of Washington.  ER-149.  He amended his complaint on February 18, 2020.  ER-119.  This operative complaint named as Defendants Ms. Dy, Ms. McDermont, Mr. Sproul, Mr. Baltazar, and Mr. Connors, and sought relief under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  ER-120, ER-127–28.[4]

The complaint included three specific claims:  (1) for violating "the equal protection clause of the 5th amendment" because there was "no rationale [sic] relation between the dissimilar treatment of [Mr. Stanard] as a pre-trial inmate," (2) for violating the "due process clause" of the "5th amendment" for failure to treat Mr. Stanard's "medical needs"; and (3) for violating the "8th Amendment" because "Defendants were deliberately indifferent to [his] serious medical needs."  ER-125.  On December 21, 2020, Defendants moved to dismiss.  ER-100.

---

[4] The amended complaint also listed the Medical Director of the Bureau of Prisons and the Regional Medical Director as Defendants.  ER-129.  Defendants did not move to dismiss these individuals, and neither the magistrate judge's report and recommendation nor the district court's order addressed claims against these parties.

2.      **The magistrate judge's report and recommendation.**

On March 10, 2021, the magistrate judge recommended that the motion to dismiss be granted with prejudice. ER-36. In reaching this conclusion, the magistrate judge noted upfront that Mr. Stanard's Fifth Amendment due process and Eighth Amendment deliberate indifference claims were two sides of the same coin: both sought redress for failure to provide adequate medical treatment. ER-43–44. Under the case law, the Fifth Amendment "applies to conditions of confinement claims asserted by federal pretrial detainees," ER-43 (citing *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979)), while the Eighth Amendment is "concerned . . . after [the government] has secured a formal adjudication of guilt," ER-43 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)).

Because Mr. Stanard sought treatment *after* his conviction, "the Eighth Amendment and not the Fifth Amendment is implicated." ER-44. That determination required dismissal of Mr. Stanard's Fifth Amendment due process claim as duplicative. *Id.*

The magistrate judge then turned to the remaining claims: deliberate indifference under the Eighth Amendment and violation of the Fifth Amendment's equal protection clause. On Mr. Stanard's Eighth Amendment claim,

12

the magistrate judge acknowledged that *Carlson v. Green*, 446 U.S. 14 (1980), was a "close[] analogue" to the present case. ER-46. But it differentiated *Carlson* by noting that the inmate there "suffered an asthmatic attack," that the inmate was not given medical care for this serious condition, and that the inmate later died from his illness. ER-46–47. Mr. Stanard, on the other hand, was denied treatment for a different disease, was considered "the lowest of the three priority levels based on his APRI score," and the "primary focus" of his complaint was, according to the magistrate judge, challenging "the application of a [medical care] policy." ER-47–48.

Accordingly, the magistrate judge held that Mr. Stanard's "Eighth Amendment claim . . . present[ed] a new *Bivens* context," different from that of *Carlson.* ER-48. The magistrate judge proceeded to examine whether Mr. Stanard had available "any other adequate alternative remedy," and whether there were "any 'special factors' that [led] the court to believe that Congress, instead of the courts, should be the one to authorize a suit for money damages." ER-42 (quoting *Rodriguez v. Swartz*, 899 F.3d 719, 738 (9th Cir. 2018), *vacated on other grounds, Swartz v. Rodriguez*, 140 S. Ct. 1258 (2020) (alteration omitted)).

13

The magistrate judge explained that "several alternative remedies [were] available to" Mr. Stanard, including injunctive relief. ER-48. These remedies were appropriate because, in its view, Mr. Stanard was "effectively challenging a BOP policy." *Id.* Given the availability of alternative remedies, the magistrate judge declined to undertake a special factors analysis. As a final note, the magistrate judge also added that Mr. Stanard had "fail[ed] to state a cognizable claim for relief," ER-49, because his allegations were "vague and conclusory," ER-51.

The magistrate judge dismissed Mr. Stanard's equal protection claim in short order. It held that Mr. Stanard's claim "present[ed] a new *Bivens* context" because "[t]he Supreme Court has never recognized a *Bivens* remedy for Fifth Amendment equal protection claims arising in the prison context." ER-45. That doomed the claim, given the alternative remedies analysis the magistrate judge undertook as to the Eighth Amendment claim.

### 3. The district court's order.

Mr. Stanard filed several objections to the magistrate judge's report and recommendation. *See generally* ER-24. On July 1, 2021, the district court approved and adopted the magistrate judge's report and recommendation. ER-4. In so doing, the district court did not go through each of Mr. Stanard's

14

objections. ER-8–12. It instead concurred that Mr. Stanard could not "bring his Eighth Amendment claim under *Bivens*," thus obviating the need to resolve every objection. ER-12. The district court substantially reiterated the "key factual distinctions" recited by the magistrate judge: that *Carlson* involved an asthmatic who died, while Mr. Stanard was challenging a BOP policy, rather than individual wrongdoing. ER-10–11.

### 4. Proceedings before this court.

On July 19, 2021, Mr. Stanard filed a notice of appeal. ER-206. Thereafter Mr. Stanard retained counsel from Rights Behind Bars and began court-ordered mediation. Dkt. Nos. 2, 3. On October 5, 2021, counsel for Northwestern Pritzker School of Law's Federal Appellate Clinic entered an appearance on behalf of Mr. Stanard, and on October 18, 2021, the case was released from the mediation program. Dkt. Nos. 7, 10. The parties agreed to January 18, 2022 as the deadline for filing the opening brief. Dkt. No. 13.

## SUMMARY OF ARGUMENT

When a prisoner is deprived of adequate medical treatment, money damages are often the sole avenue of meaningful relief. That is because the prisoner might have passed away from their ailment, *see Carlson v. Green*, 446

15

U.S. 14, 16 n.1 (1980), been released from prison, or already experienced severe harm—rendering equitable relief moot. In these circumstances, a *Bivens* action is not just the appropriate remedy. It is the *only* remedy because, in such situations, "it is damages or nothing." *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 410 (1971) (Harlan, J., concurring).

The district court's decision misunderstands this practical and legal reality. Under its all-too-cramped reading of *Bivens* and *Carlson*, the choice for prisoners like Mr. Stanard is not "damages or nothing." *Id.* It is "nothing or nothing." In reaching such a determination, the district court committed four separate errors, each requiring reversal.

**I.    *First*, the district court erred in holding that Mr. Stanard's "Eighth Amendment *Bivens* claim arose in a new context." ER-11.**

**A.**    That is plainly not the case. Rather, Mr. Stanard's Eighth Amendment claim arises in the same context as that of *Carlson v. Green*. There, as here, federal prison officials "were deliberately indifferent to" plaintiff's "serious medical needs," in contravention of the Eighth Amendment. *Carlson*, 446 U.S. at 16 n.1. And there, as here, money damages were the only form of meaningful relief.

Rather than draw on such core similarities, the district court spotlighted the "difference in the factual context of the two cases," ER-47, because *Carlson* involved someone who died from a "chronic asthmatic condition" rather than the "administration of Hepatitis C treatment," which Mr. Stanard ultimately received, ER-10.

These are not tenable distinctions. "In *Carlson*, the Supreme Court recognized an Eighth Amendment *Bivens* claim based on prisoner mistreatment," *Reid v. United States*, 825 F. App'x 442, 444 (9th Cir. 2020), not solely for a failure to provide care to a chronic asthmatic resulting in death. Thus, courts have repeatedly recognized that prisoners may, per *Carlson*, bring mistreatment claims in various circumstances. *See, e.g.*, *Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980). Mr. Stanard's cause of action falls well within this heartland.

**B.** *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), is particularly instructive in determining whether a case presents a new or arises out of an existing *Bivens* context. Under *Abbasi*, a case presents a new *Bivens* context only when it is "different in a *meaningful way* from previous *Bivens* cases decided by [the Supreme] Court." 137 S. Ct. at 1859 (emphasis added). Merely cherry-picking factual differences, as the district court did here, does not track the

sort of "meaningful" analysis that *Abbasi* requires. *Id.*; *see also Ioane v. Hodges*, 939 F.3d 945, 952 (9th Cir. 2018); *Jacobs v. Alam*, 915 F.3d 1028, 1036 (6th Cir. 2019).

Instead, courts must examine "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action," and other conditions. *Abbasi*, 137 S. Ct. at 1860. The district court undertook no such examination. At most, it held that Mr. Stanard's complaint was "based solely on a BOP policy," which would preclude a *Bivens* claim. ER-47; *Abbasi*, 137 S. Ct. at 1860. But that assertion holds no water.

Mr. Stanard is *not* challenging BOP policy. He is seeking damages for the failure by certain prison officials affiliated with SeaTac to follow the policy. After all, BOP policy specifically provides—and the Eighth Amendment so requires—individualized case assessments for the medical needs of prisoners.[5] Defendants here failed to conduct such an inquiry.

---

[5] *See, e.g.*, Fed. Bureau of Prisons, Clinical Guidance: Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection (January 2018) at 8 (treatment "will be made on an individual basis and will be determined by a compelling or urgent need for treatment.") (hereinafter "Jan. 2018 HCV Guidance"); *accord Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

18

Instead, based solely on test scores and Mr. Stanard's purported pre-trial detention status, Defendants categorically denied Mr. Stanard's request for antiviral medication. But neither federal law nor relevant clinical guidance has *ever* given officials license to enforce a blanket ban against treatment on such grounds. Pursuing a legal remedy under such circumstances comports fully with what *Bivens* and *Carlson* were intended to protect. *See Butz v. Economou*, 438 U.S. 478, 504 (1978) ("*Bivens* established that a citizen suffering a compensable injury to a constitutionally protected interest [may] invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official.").

## II. *Second*, even if Mr. Stanard's Eighth Amendment claim does present a new *Bivens* context, it would constitute at most a modest extension of *Carlson*.

Although courts should proceed with "caution before extending *Bivens* remedies into any new context," *Abbasi*, 137 S. Ct. at 1857 (internal quotation marks omitted), a modest extension may be warranted in *some* cases, *see Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018) (recognizing a new *Bivens* context shortly after *Abbasi* in immigration-related proceedings). The appropriate inquiries are whether "there is an alternative remedial structure

present in a certain case" and whether "there are special factors counselling hesitation." *Abbasi*, 137 S. Ct. at 1857–58 (internal quotation marks omitted).

**A.** As to alternative remedies, Defendants offered a long string of possibilities in their motion to dismiss: injunctive relief, the BOP's administrative remedy program, the Prison Litigation Reform Act, the Federal Tort Claims Act, state law, and the Administrative Procedure Act. ER-48. The district court eschewed analyzing each alternative, focusing instead on injunctive relief, the "remed[y] available . . . under the BOP's administrative remedy program." *Id.* According to the district court, because Mr. Stanard is "effectively challenging a BOP policy," he should have "brought claims for injunctive relief" under the BOP's grievance procedures. *Id.*

That reasoning misses the mark for three reasons. As has been covered, Mr. Stanard is not challenging BOP policy. He is challenging a failure by Defendants to adhere to that policy and the harm he suffered as a result. In any event, injunctive relief is moot: "[a]n inmate's release" or transfer "from prison . . . generally will moot any claims for injunctive relief." *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995). That is doubly true here, given Mr. Stanard's transfer to Sheridan *and* his successful treatment at Sheridan for his HCV. Finally, there is no either/or requirement when it comes to injunctive

20

relief and damages. As the Supreme Court has made clear, the BOP's griev-ance process does not foreclose a *Bivens* action. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002).

The remaining alternative remedies offered by Defendants—the FTCA, state law, and the APA—all fail to withstand scrutiny. None offer Mr. Stanard appropriate relief, and none displace a *Bivens* cause of action.

**B.**  The special factors analysis also tips in Mr. Stanard's favor. His claim does not raise separation of powers concerns, does not impair federal operations or implicate federal fiscal policy, and does not involve national se-curity. *See Abbasi*, 137 S. Ct. at 1860–61; *Hernandez v. Mesa*, 140 S. Ct. 735 (2020). It merely involves an individual seeking monetary relief against offi-cials acting in an unconstitutional manner. Such "garden-variety *Bivens* claims" have been recognized and adjudicated for decades. *Jacobs*, 915 F.3d at 1038–39; *Ortiz v. Webster*, 655 F.3d 731 (7th Cir. 2011).

**C.**  The district court offered a final basis for dismissing Mr. Stanard's complaint: that, "[e]ven assuming Plaintiff could bring a *Bivens* claim under the Eighth Amendment," "he fails to state a cognizable claim for relief." ER-49. In reaching this conclusion, it engaged in a summary judgment-like review of the available allegations, finding them "vague and conclusory." ER-51.

That sort of review is not appropriate at this stage of litigation. No authority requires plaintiffs proceeding under *Bivens* to survive summary judgment at the pleading stage. All that is required is that Mr. Stanard plausibly state a claim for relief. He has done that.

**III.** **_Third_, the district court erroneously dismissed Mr. Stanard's Fifth Amendment claim, asserting that courts have "never recognized a _Bivens_ remedy for Fifth Amendment equal protection claims arising in the prison context." ER-45.**

**A.** This reflexive dismissal overlooks the interplay between *Carlson v. Green* and *Davis v. Passman*. In *Carlson*, plaintiff alleged that prison officials "violated the . . . *the equal protection component of the Fifth Amendment* in addition to the Eighth Amendment's prohibition against cruel and unusual punishment." *Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978) (emphasis added). The Seventh Circuit recognized that plaintiff could proceed under a *Bivens* theory for claims under both the Fifth and Eighth Amendments. *Id.*

The Seventh Circuit's decision regarding plaintiff's Fifth Amendment claim was, in fact, so uncontroversial that, in seeking a writ of certiorari, the Department of Justice did not even request review of that particular claim. Reply Br. for Pet'rs, *Carlson v. Green*, 446 U.S. 14 (1980), 1980 WL 371715, at

*5 n.4. Instead, the *only* questions presented involved application of *Bivens* to the Eighth Amendment deliberate indifference claim. *Id.* As to the Fifth Amendment claim, the Department of Justice merely urged that it be dismissed for the same reasons as the Eighth Amendment claim. *Id.* But if the Court declined to dismiss the Eighth Amendment claim, then the Fifth Amendment claim would also survive because—according to the Department of Justice—"recognition of a *Bivens*-type action *would ordinarily he [sic] appropriate*" under such circumstances. *Id.* (emphasis added).

In its subsequent decision, the Court explained that "petitioners were deliberately indifferent to [plaintiff's] serious medical needs, *and that their indifference was in part attributable to racial prejudice*," thus both affirming plaintiff's Eighth Amendment deliberate indifference claim and nodding favorably towards the Fifth Amendment equal protection claim. *Carlson*, 446 U.S. at 16 n.1 (emphasis added). This posture—that prison officials did not bother challenging plaintiff's ability to bring an equal protection claim, and the Court's implicit acknowledgment of the viability of such a claim—confirms that equal protection claims fall within *Carlson*'s purview.

**B.** To the extent there is any uncertainty, *Davis v. Passman*, 442 U.S. 228 (1979), settles all remaining doubt. *Davis* recognized that a plaintiff could

bring "a cause of action for damages . . . directly under the Fifth Amendment" for an "equal protection" violation. *Id.* at 232, 235. Crucially, in reaching its decision, the Court was more than just aware of *Carlson*. It cited *Carlson* in reaching its ultimate conclusion: "We conclude, therefore, that [Davis] . . . has a cause of action under the Fifth Amendment." *Davis*, 442 U.S. at 244 (citing *Green v. Carlson*, 581 F.2d 669 (7th Cir. 1978)).

    **C.** The district court's opinion lacks the foregoing analysis. Had it undertaken such a review, it would have arrived at a different result: Mr. Stanard's equal protection claim does not present a new *Bivens* context, but lands comfortably within the contours of *Carlson* and *Davis*.

    **IV.** *Fourth***, even if Mr. Stanard's Fifth Amendment claim presents a new *Bivens* context, no circumstances counsel against recognizing an extension.**

    Mr. Stanard's Fifth Amendment claim does not constitute a radical departure from existing precedent. After all, per *Carlson*, plaintiffs like Mr. Stanard can raise *Bivens* claims in the prison context. And per *Davis*, plaintiffs like Mr. Stanard frequently raise *Bivens* claims for violations of the Fifth Amendment's equal protection component. Finally, there is abundant case law discussing the need to treat pretrial detainees, post-conviction inmates, and

sentenced individuals on a generally equal basis—the exact sort of claim Mr. Stanard seeks to pursue. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

## STANDARD OF REVIEW

An order granting a motion to dismiss for failure to state a claim is reviewed de novo. *See Palm v. L.A. Dep't of Water & Power*, 889 F.3d 1081, 1085 (9th Cir. 2018). De novo review also applies when reviewing a magistrate judge's report and recommendation. *Rasberry v. Garcia*, 448 F.3d 1150, 1152–53 (9th Cir. 2006).

In examining a motion to dismiss, courts must take all factual allegations in a complaint as true, and deny the motion to dismiss if the complaint contains sufficient factual allegations to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pro se complaints are liberally construed at the motion to dismiss stage and are "held to less stringent standards than formal pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## ARGUMENT

## I.  THE DISTRICT COURT ERRED IN FINDING THAT MR. STANARD'S EIGHTH AMENDMENT CLAIM PRESENTED A NEW *BIVENS* CONTEXT.

### A.  Mr. Stanard's Eighth Amendment claim arises in the same context as *Carlson v. Green.*

*Carlson v. Green*, 446 U.S. 14 (1980), recognized a *Bivens* claim against prison officials who denied an inmate medical treatment.  Mr. Stanard's case arises in that same context.  As in *Carlson*, Mr. Stanard alleges a failure by officials to treat his serious medical condition.  As in *Carlson*, Mr. Stanard experienced this "denial of treatment" because Defendants were "deliberate[ly] indifferen[t] to [his] medical needs."  ER-141.  And, as in *Carlson*, money damages are Mr. Stanard's *only* route of adequate relief—he has, because of his transfer to Sheridan, received an individualized case assessment of his medical needs and treatment for his HCV.  That obviates the need for equitable relief.

The district court, to its credit, recognized that this case was akin to *Carlson*, as "both cases pertain to the provision of medical care in [a] federal correctional facility."  ER-46.  But the district court nonetheless distinguished the situations, stressing the "substantial difference in the factual context of the two cases."  ER-47.  Two differences stood out.

One, *Carlson* involved a "chronic asthmatic," ER-46, while Mr. Stanard sought treatment for "Hepatitis C," ER-47. And two, the "failure of the medical delivery system . . . ultimately resulted in the prisoner's death" in *Carlson*, while Mr. Stanard was treated—albeit after some delay—for his HCV. *Id.* ("Plaintiff . . . was . . . prevented . . . from receiving . . . immediate medical treatment.").

Courts have not read *Carlson* so narrowly: They have not limited *Carlson* to only the specific medical condition that the inmate there suffered—asthma—nor have they held that *Carlson* applies only when an inmate dies.

In *Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980), for instance, the prisoner-plaintiff was denied medical care for two months—far short of the near year Mr. Stanard was deprived of treatment. Because plaintiff was "not given any medical items or medical care," he developed "a severe skin disease." *Id.* at 639. This court's resulting decision was unequivocal: the "application of . . . *Carlson* appears to be equally appropriate in the present case." *Id.* at 642. That is because *Carlson* "established that a violation of the Eighth Amendment proscription against cruel and unusual punishment could be the basis for a *Bivens*-type action," thus paving the way for the claim in *Gillespie*. *Id.* at 641.

27

More recently, in *McRae v. Dikran*, 776 F. App'x 412, 413 (9th Cir. 2019), this court allowed a plaintiff to proceed with a *Bivens* claim because "defendants [had] performed surgery on [the inmate's] back without his consent." Just like in *Gillespie* and just like this case, the inmate did not have asthma, and did not die from his medical ailment. But those distinctions did not matter: *Carlson* "recogniz[ed] a *Bivens* claim for deliberate indifference to serious medical needs under the Eighth Amendment," not a claim limited strictly to *Carlson*'s facts. *Id.*

*Gillespie* and *McRae* mirror decisions from other circuits. *See Ortiz v. Webster*, 655 F.3d 731, 734–35 (7th Cir. 2011) (permitting *Bivens* action to proceed based on failure to treat inmate's eye condition); *Koprowski v. Baker*, 822 F.3d 248, 250 (6th Cir. 2016) ("The Supreme Court has consistently reaffirmed . . . that federal prisoners may bring *Bivens* claims under the Eighth Amendment against federal prison officials.").

The consistent thread weaving through these decisions is the understanding that federal officials who are "deliberately indifferent to [an inmate's] serious medical needs" may be held liable under *Bivens*. *Koprowski*, 822 F.3d at 249. That was the case in *Carlson*, 446 U.S. at 16 n.1; it was the case in *Gillespie*, 629 F.2d at 641, and *McRae*, 776 F. App'x at 413; and it is the case

28

here, *see* ER-119 ("The defendants . . . acted with deliberate indifference to the Plaintiff . . . for a serious medical need.").

## B. *Abbasi* confirms that *Carlson* and this case are substantially similar.

In *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856–57 (2017), the Supreme Court observed that expanding *Bivens* to a new context might be "disfavored," but raising claims within established contexts remains viable. *Carlson* is one such established context:  It "gave [plaintiffs] a damages remedy for failure to provide adequate medical treatment," and it continues to be good law.  *Id.* at 1855. Cases arise in a new context only if they are "different in a *meaningful* way" from established *Bivens* cases.  *Abbasi*, 137 S. Ct. at 1859 (emphasis added). To determine whether a difference is meaningful, *Abbasi* provides a list of factors:

1. the rank of the officers involved;

2. the constitutional rights at issue;

3. the generality or specificity of the official action;

4. the statutory or other legal mandate under which the officer was operating;

5. the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; and

6. the risk of disruptive intrusion by the Judiciary into the functioning of other branches.

*Id.* at 1860. Each factor confirms that Mr. Stanard's Eighth Amendment claim arises in the same context as *Carlson*.

*First*, Defendants here are near identical in rank to those in *Carlson*. As reflected below, both plaintiff in *Carlson* and Mr. Stanard filed suit against treating physicians, officials at the specific prison facility, and BOP administration and other leadership.

| Individual Defendants | *Carlson* | *Stanard* |
|---|---|---|
| **Treating Physicians & Staff** | Emmett Barry<br>William Walters | Maria Dy |
| **Prison Officials** | Benjamin DeGarcia<br>*Chief Medical Officer* | Louise McDermont<br>*Health Services Administrator*<br><br>Dan Sproul<br>*Warden* |
| **BOP Admin. & Other Leadership** | Norman Carlson<br>*Director of BOP*<br><br>Robert Brutshe<br>*Assistant Surgeon General* | Juan Baltazar<br>*BOP Western Regional Medical Director*<br><br>Ian Connors<br>*Administrator of National Inmate Appeals* |

*Second*, both cases involve alleged violations of the Eighth Amendment. *Carlson* found *Bivens* relief proper where prison officials were "deliberately indifferent" to a prisoner's "serious medical needs," and that same rationale

underlies Mr. Stanard's Eighth Amendment claim.  *Carlson*, 446 U.S. at 16 n.1, 17; ER-130.

The *third* and *fourth* factors, on the generality or specificity of the official action and the legal mandate which Defendants were operating, are closely related.  On both, the district court asserted that Mr. Stanard's claims were "based solely on [] BOP policy" and that, as such, he could not proceed.  ER-47.  That interpretation misreads the operative complaint.

### 1. The guidance requires an individualized assessment, which Defendants did not do.

Mr. Stanard is *not* challenging BOP policy.  He is challenging the failure to provide him adequate medical care as both the Eighth Amendment and the pertinent policies require.  These failures are evident when examining the policy's—i.e., the HCV Clinical Guidance—actual text.  The January 2018 HCV Clinical Guidance states, on the very first page, that "[p]roper medical practice necessitates that all cases are evaluated on an individual basis [so] that treatment decision are patient-specific."  Jan. 2018 HCV Guidance at 1.  It reiterates that point when discussing treatment priority levels, emphasizing that, whatever one's test scores, all decisions must "be made on an individual basis."  *Id.* at 8.

Despite both this general and specific admonition, Defendants failed to provide Mr. Stanard "patient-specific" care. *Id.* at 1. Mr. Stanard "asked multiple times to see a specialist" to better determine the state of his condition. ER-134. He received no such appointment. Mr. Stanard reported worsening symptoms but was given a common refrain: his APRI levels were too low to be considered a treatment priority.

But APRI scores fluctuate—at one point, Mr. Stanard's APRI level was 2.51, ER-70, which would have placed him in Priority Level 1, the highest priority for treatment—and are not necessarily a definitive report on one's HCV progression. The Clinical Guidance reinforces this point, requiring officials to carefully consider test scores alongside other symptoms, ailments, and comorbidities. Defendants Dy, McDermont, and Sproul instead resorted to default categories, making no effort at individualized analysis. ER-127–28.

Even when a Defendant did attempt an individualized analysis, that analysis was so plainly faulty and problematic as to be irrelevant. Defendant Connors, in denying treatment for Mr. Stanard, relied on a liver biopsy from a decade prior. ER-134. That reliance overlooks the fundamental fact that HCV is a progressive disease, with the most severe conditions taking years to

fully develop.[6]  Defendant Connors—whose role is to oversee the medical care of prisoners, a population where HCV is so common as to require near annual updates to the Clinical Guidance—would have almost certainly known this fact.  Using decades-old records to deny care despite this information supports Mr. Stanard's claim for redress.

### 2. Mr. Stanard seeks individual redress for individual wrongdoing.

The parties named in this suit further show that Mr. Stanard is *not* seeking a wholesale re-write of policy.   He is challenging actions that were not in accordance with then-existing policy.  Mr. Stanard was categorically denied treatment while at SeaTac, and then provided that very treatment at Sheridan following his transfer.  That is because SeaTac officials did *not* follow the law or relevant guidance, while Sheridan officials did.  And so Mr. Stanard named as Defendants officials affiliated with SeaTac, and not any officials affiliated with Sheridan.  That pleading choice underscores Mr. Stanard's challenge of specific instances of individual misconduct and wrongdoing, precisely what *Bivens* protects.  *See Carlson*, 446 U.S. at 21.

---

[6] *See Hepatitis C Liver Damage Progression,* Hepatitis C Trust, http://www.hepctrust.org.uk/information/impact-hepatitis-c-liver/progression-hepatitis-c.

### 3. Invoking the policy alone does not shield Defendants from liability.

To be sure, there is language in the amended complaint that could be construed as challenging the application of BOP policy. *See, e.g.*, ER-122 (Defendant McDermont "relied upon Bureau policy and set criteria to deny treatment."). But there is also an available alternative reading: that Defendants cannot escape legal liability by merely invoking a policy by name, while acting inconsistently with the policy in practice.

That should be an unremarkable point. After all, virtually no prison official will ever state outright that they are denying treatment in violation of official policy. Consequently, while every Defendant here might have *stated* that he or she was following policy, each Defendant also *acted* in clear violation of any such policy.

Defendant Dy informed Mr. Stanard that he was "not qualified for Hep. C. treatment" based solely on his APRI score. ER-70. The policy, with its requirement for individualized analysis, imposes no such categorical bar. Defendants McDermont, Sproul, and Baltazar informed Mr. Stanard that he would "not be able to get any treatment," ER-127—again, nothing in the policy or the law allows a Defendant to categorically deny *all* treatment to an entire group of inmates. And Defendant Connors, of course, sought to diagnose and

34

offer a prognosis to Mr. Stanard based on a decades-old biopsy. ER-134. That cannot square with the careful, "patient-specific" care the Clinical Guidance requires. Jan. 2018 HCV Guidance at 1. Simply saying one is following policy does not make it so.

### 4.     Mr. Stanard's allegations should be liberally construed.

Moreover, to the extent there is uncertainty about the operative complaint, "[a] document filed *pro se* is to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotes omitted) (quoting *Estelle*, 429 U.S. at 106).

*Erickson*, notably, also involved the alleged deprivation of HCV treatment for a prisoner, in violation of the Eighth Amendment. *Id.* at 89. The lower courts dismissed the complaint as "conclusory," *id.*, even though plaintiff there—just like Mr. Stanard—detailed when defendants had denied him HCV treatment and the "continued damage to [his] liver" that resulted. *Id.* at 91–92. That dismissal was ultimately held to be improper. As the Supreme Court explained, a plaintiff need "only [provide] a short and plain statement of the claim showing that the pleader is entitled to relief," and "a *pro se* complaint,

however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* at 93, 94 (internal quotation marks omitted).

Consonant with *Erickson*, this court has stated that "[t]he obligation to construe *pro se* filings liberally means courts must frequently look to the contents of a *pro se* filing rather than its form." *Ross v. Williams*, 950 F.3d 1160, 1173 n.19 (9th Cir. 2020) (en banc); *see id.* (citing cases). Applying that principle here, what matters—for purposes of Mr. Stanard's *Bivens* claim—is not what a few stray sentences in the complaint, plucked out of context, might say. What matters is what *actually* happened, and what *actually* happened is that Defendants' actions did not track with what the policy or the Eighth Amendment require.

### 5. Dismissal with prejudice was improper.

At minimum, and as a concluding point, the district court erred by dismissing Mr. Stanard's complaint with prejudice, because "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam); *see also Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014)

36

("Leave to amend shall be freely given when justice so requires, and this policy is to be applied with extreme liberality.") (internal quotation marks and citation omitted). In examining whether to dismiss with prejudice, the guiding factor is the "futility of" any potential "amendment." *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001). Amendment here would not have been futile: Mr. Stanard could readily amend his allegations to make clear his challenge to the individual wrongdoing of Defendants, *not* to the overall HCV Clinical Guidance.

Next, the *fifth Abbasi* factor, the availability of judicial guidance, is "analogous to the question in a qualified immunity analysis of whether the law was 'clearly established' at the time of the officer's actions." *Ioane v. Hodges*, 939 F.3d 945, 952 n.3 (9th Cir. 2018). That box is easily checked here.

An official's deliberate indifference to an inmate's serious illness constitutes an "unnecessary and wanton infliction of pain," in violation of the Eighth Amendment. *Estelle*, 429 U.S. at 104–05. Such claims were viable pre-*Carlson*, and apply with equal force post-*Abbasi*. *See Reid*, 825 F. App'x at 444–45 (courts "[c]ontinu[e] to recognize Eighth Amendment *Bivens* claims post-*Abbasi* . . . because there is extensive case law establishing . . . the standard for circumstances that constitute cruel and unusual punishment.").

37

To state such a claim, a plaintiff must allege: (1) "that the deprivation" of medical care "was serious enough to constitute cruel and unusual punishment," and (2) that the defendant was "deliberate[ly] indifferen[t]," i.e., the "official knows of and disregards an excessive risk to inmate health and safety." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (internal quotation marks and citations omitted).

Mr. Stanard's allegations satisfy both elements. As a general matter, HCV "quite obviously cause[s] serious health problems, and can result in death." *Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007); *see also Broughton v. Cutter Lab'y*s., 622 F.2d 458 (9th Cir. 1980) (reversing dismissal of a prisoner suit alleging that a six-day delay in treating Hepatitis C constituted deliberate indifference); *Atkins v. Parker*, 972 F.3d 734, 739 (6th Cir. 2020) ("[E]veryone agrees that [H]epatitis C is an objectively serious medical condition."); *Brown v. Wolf*, 705 F. App'x 63, 66 (3d Cir. 2017) ("Hepatitis C is a serious, potentially fatal disease."); *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) ("Hepatitis C is a serious medical condition."); *Mitchell v. Nobles*, 873 F.3d 869, 876 (11th Cir. 2017) (HCV is "so obvious[ly]" a serious medical issue "that even a lay person would easily recognize the necessity for a doctor's attention") (citation omitted).

38

Moreover, Mr. Stanard made clear the gravity of his own specific HCV symptoms. He attested to his "serious need" to receive treatment because "Hep[atitis] C. is a silent killer," which had claimed the life of a fellow inmate at SeaTac. ER-131, ER-137. Just like that inmate, Mr. Stanard described "fatigue, [b]loating in the abdominal area [and] swelling of [his] liver." ER-133. He had a "tough time swallowing," lived in "days of pain," and was "unable to eat from [his] liver pushing [his] stomach." ER-135, ER-137.

Defendants likewise knew of Mr. Stanard's HCV diagnosis and his need to receive treatment because he told them—repeatedly. He filed grievance forms with each Defendant, either through a BP-8 (Dy and McDermont), BP-9 (Sproul), BP-10 (Baltazar), or BP-11 (Connors). He spoke informally with Defendants Dy, McDermont, and Sproul. ER-134. *No* Defendant responded by undertaking the individualized analysis required by law and policy.

*Sixth*, there is little risk here of judicial disruption. Unlike in *Abbasi*, Mr. Stanard is not challenging a "well documented" national program set by the "Federal Government" and explicitly designated as a "prerogative of [both] Congress and [the] President." 137 S. Ct. at 1861–62. Instead, Mr. Stanard raises his claims in a "routine" setting, seeking individual redress for individual wrongdoing within a prison facility. *Lanuza v. Love*, 899 F.3d 1019,

1030 (9th Cir. 2018) (*Bivens* claim allowed to proceed against individual misconduct in "routine" immigration proceedings).

*Bivens* claims brought by prisoner-plaintiffs have been litigated and adjudicated in federal court for years. To even bring his claim, indeed, Mr. Stanard needed to complete a form specifying on what basis he was proceeding. ER-120. The standardized version of this form for the Western District of Washington lists just two options for prisoner-plaintiffs—42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)—and Mr. Stanard selected the latter. This form is near identical to the one made available by the United States Courts, for "Complaint for Violation of Civil Rights (Prisoner)."[7]

In short, *Carlson* "allow[s] a *Bivens* claim for prisoner mistreatment." *Abbasi*, 137 S. Ct. at 1864. Courts have repeatedly acknowledged that such relief is available. *Reid*, 825 F. App'x at 444; *Koprowski*, 822 F.3d at 250; *Gillespie*, 629 F.2d at 642. Far from breaking new ground, Mr. Stanard's case falls within the context that *Bivens*, *Carlson*, and its progeny set out. The district court's cabined reading of *Carlson* to preclude Mr. Stanard's Eighth

---

[7] Civil Pro Se Forms, Complaint for Violation of Civil Rights (Prisoner), U.S. COURTS, https://www.uscourts.gov/forms/pro-se-forms/complaint-violation-civil-rights-prisoner (effective Dec. 1, 2016).

Amendment claim constitutes an unwarranted and unjustified retrenchment of *Bivens*.

## II.   MR. STANARD'S EIGHTH AMENDMENT CLAIM IS, AT MOST, A MODEST EXTENSION OF *CARLSON*.

Even if Mr. Stanard's claims were "meaningful[ly]" different from those in *Carlson*, that finding alone does not preclude a cause of action.  Instead, courts must consider whether Mr. Stanard has available any "alternative forms of judicial relief" and whether "there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'"  *Abbasi*, 137 S. Ct. at 1849, 1857, 1859.

### A.   There are no adequate alternative remedies.

As to remedies, Defendants offered a litany in moving to dismiss:  injunctive relief; the BOP administrative remedy program; the Federal Tort Claims Act ("FTCA"); Washington state law; and the Administrative Procedure Act ("APA").  *See* ER 110–11.  The district court was "not convinced that Plaintiff had available to him th[is] plethora of remedies."  ER-48.

Instead, it examined only injunctive relief, the "remed[y] available to [Mr. Stanard] under the BOP's administrative remedy program," as provided by the Prison Litigation Reform Act ("PLRA").  *Id.*  As Defendant Baltazar

41

noted, this "Administrative Remedy process *does not* provide for monetary compensation." ER-161 (emphasis added). The grievance procedures *only* provide injunctive relief. And that sort of relief is inadequate for three reasons.

### 1. Injunctive relief is not an adequate alternative remedy.

First, injunctive relief *might* be appropriate if Mr. Stanard were challenging a nationwide policy, or seeking prospective changes, but that is *not* what he seeks to do. As *Abbasi* explains, a *Bivens* action typically implicates "individual instances" of mistreatment, "which due to their very nature are difficult to address except by way of damages actions after the fact." *Abbasi*, 137 S. Ct. at 1862. That is what happened here.

As covered, the relevant guidance requires "patient-specific" treatment decisions. Jan. 2018 HCV Guidance at 1. But there are numerous "individual instances," *Abbasi*, 137 S. Ct. at 1862, where Defendants failed to provide Mr. Stanard with "patient-specific" care. Defendants Dy, McDermont, and Sproul all denied Mr. Stanard treatment because he "was a pre-trial inmate" and because his APRI scores made him a low treatment priority. ER-127–28. Defendant Connors similarly failed to properly analyze Mr. Stanard's medical condition. *Id.* Providing an injunction, even at the time, would not have

42

stopped these "individual instances" of mistreatment—let alone years later. *Abbasi*, 137 S. Ct. at 1862.

Further, any sort of injunctive relief here would be moot. That is because "[a]n inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief." *Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995) (citing *Preiser v. Newkirk*, 422 U.S. 395, 402–03 (1975)). The one exception is when there is a "reasonable expectation that [an inmate] will be transferred back" to the original facility, but that exception is doubly inapplicable here. *Id.* at 1369. There is nothing to indicate that Mr. Stanard will be transferred back to SeaTac. Moreover, Mr. Stanard has already received antiviral treatment—provided *after* his transfer from SeaTac. This is not a situation where Defendants will or even could deny him treatment again.

But the damage of living in pain for months without treatment is done, and some complications may well be "irreversible." *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1034 (8th Cir. 2018). Prospective "equitable relief does nothing to cure the damage [Mr. Stanard has] already suffered," *Reid*, 825 F. App'x at 445, making this a classic instance of "damages or nothing," *Bivens*, 403 U.S. at 410 (Harlan, J., concurring).

Further, prisoner-plaintiffs are not necessarily compelled to choose between injunctive relief and damages. The PLRA's historical background in fact makes clear that the BOP's administrative remedy process and a *Bivens* action are not mutually exclusive. In *McCarthy v. Madigan*, 503 U.S. 140, 152 (1992), the Supreme Court opined that a prisoner "seeking only money damages has everything to lose and nothing to gain from being required to exhaust his claim under the internal grievance procedure" before bringing a *Bivens* claim. In response, Congress enacted the PLRA, which imposed an exhaustion requirement to any suit brought "under section 1983 . . . or any other [f]ederal law." 42 U.S.C. § 1997e.

That amendment means that "federal prisoners suing under *Bivens* . . . must first exhaust inmate grievance procedures." *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *accord Abbasi*, 137 S. Ct. at 1865.[8] Consequently, by recognizing that prisoners must first exhaust BOP remedies *before* bringing a *Bivens* action, Congress could not have intended for the PLRA and these grievance procedures to completely displace a *Bivens* remedy. Even Defendants appear

---

[8] Mr. Stanard exhausted the BOP's grievance procedures, having filed a BP-8, BP-9, BP-10, and BP-11, and received responses as to each. *See Nunez*, 591 F.3d at 1219–20 (noting that BP-11 is final step for exhaustion).

44

to concede this point, stating that "[o]ne hallmark of the PLRA is that it narrows the scope of relief a prisoner can pursue *outside of the Eighth Amendment context*." ER-112 (emphasis added). The corollary of that statement, of course, is that a prisoner *can* continue to pursue *Bivens* relief under the Eighth Amendment, which is what Mr. Stanard has done.

### 2. The FTCA, state law, and the APA do not displace *Bivens.*

Although the district court did not examine the FTCA, Washington state law, or the APA as appropriate alternative remedies, these avenues plainly do not offer Mr. Stanard adequate relief.

Start with the FTCA. *Carlson* makes *explicit* that the FTCA does *not* displace *Bivens* relief. As *Carlson* explains: The "FTCA was enacted long before *Bivens* was decided, but when Congress amended [the] FTCA in 1974 to create a cause of action against the United States for intentional torts . . . that amendment *made it crystal clear* that Congress views [the] FTCA and *Bivens* as parallel, complementary causes of action." *Carlson*, 446 U.S. at 19–20 (emphasis added); *see also id.* (Congressional comment that "this provision should be viewed as a counterpart to the *Bivens* case.") (citing S. Rep. 93-588 at 3 (1973)).

Congress reaffirmed this point in 1988, when it again amended the FTCA. These amendments state that the exclusivity of the FTCA "*does not extend*" to "a civil action against an employee of the Government . . . for a violation of the Constitution." 28 U.S.C. § 2679(b)(2) (emphasis added). This language "made clear that [Congress] was not attempting to abrogate *Bivens*." *Hernandez v. Mesa*, 140 S. Ct. 735, 748 n.9 (2020). Because the two are complementary, the FTCA cannot and does not bar a *Bivens* claim.

Second, the FTCA, through the Westfall Act, has also eliminated the availability of Washington state law claims. Under the Westfall Act, when a tort action naming a federal employee as a defendant "is launched in a state court" and the defendant is acting within the scope of employment, "the action 'shall be removed' to the appropriate federal district court." *Osborn v. Haley*, 549 U.S. 225, 241 (2006) (citing 28 U.S.C. § 2679(d)(2)). Then, the "United States is substituted as defendant" in place of the employee and the case is "thereafter governed by the Federal Tort Claims Act." *Id.* at 230. That gives the employee "absolute immunity." *Id.* at 229.

In short, through removal and substitution, Congress has eliminated the availability of a state law claim for cases just like this one. Thus, in *Reid v. United States*, this court dismissed state law claims as an alternate remedy

because, consistent with the Westfall Act, "state-law remedies only exist for actions outside the scope of employment." 825 F. App'x at 445. And once these state law claims are swapped in for the FTCA, the case returns to the same posture as above: An FTCA claim does "not . . . abrogate [a] *Bivens*" action, *Hernandez*, 140 S. Ct. at 748 n. 9, and "does not offer a means for deterring future misconduct" by individual officials, *Reid*, 825 F. App'x at 445.

Finally, any suggestion that the APA might provide a remedy is baseless. Under the APA, a plaintiff can seek review of: (1) "*[a]gency action* made reviewable by statute" and (2) "final *agency action* for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). Thus, by the APA's own terms, there must be some *agency action* to review.

Agency action "includes the whole or a part of an agency rule . . . or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Agency action does *not* include individual officer actions unrelated to an agency decision. Compliance, or noncompliance, with the HCV Clinical Guidance is not related to a final agency decision. The law on this point is well-settled: "Program Statements are internal statements of Bureau of Prison policies . . . not [] adopted through rulemaking procedures, 5 U.S.C. § 553(b)(3)(A), [and] do not create entitlements enforceable under the APA." *Robinson v. Sherrod*,

631 F.3d 839, 842 (7th Cir. 2011). "The same holds for the Clinical Practice Guidelines." *Id.*

Moreover, even if Mr. Stanard *could* bring an APA claim, the APA would only provide him with injunctive relief: "Pursuant to 5 U.S.C. § 702, a plaintiff must seek 'relief *other than money damages*.'" *Harger v. Dep't of Labor*, 569 F.3d 898, 904 (9th Cir. 2009) (citing *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 929 (9th Cir. 2008)) (emphasis added). Mr. Stanard only seeks money damages. Just as injunctive relief through the BOP grievance process is inadequate, injunctive relief under the APA would fail to compensate him for the deterioration of his health while Defendants withheld treatment.

### 3.     No special factors counsel hesitation.

In deciding whether to extend *Bivens*, courts must also, along with looking at alternative remedies, undertake a "special factors" analysis. *Abbasi*, 137 S. Ct. at 1857. Although the Supreme Court "has not" exhaustively listed out these factors, it has emphasized that any "inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857–58. Consonant with that guidance, courts regularly identify four factors: (1) separation of powers concerns; (2) whether relief will

48

impair federal operations; (3) the impact on federal fiscal policy; and (4) implications on national security. *Id.* None of those factors "counsel hesitation" here. *Id.*

*First*, separation of powers issues arise when the Judiciary is "asked to fashion constitutional remedies" in a sphere where Congress has spoken. *Hernandez*, 140 S. Ct. at 749. But *Carlson* itself explained that *Bivens* relief for failure to provide adequate medical attention was appropriate because "we have here no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment may not recover money damages from the agents but must be remitted to another remedy." 446 U.S. at 19.

What was true then remains true today. Congress has declined—through the PLRA, the FTCA, or any other type of legislation—to bar prisoners from asserting *Bivens* claims. To the contrary, "there is strong evidence that Congress assumed that *Bivens* remedies would be available to prisoners when it enacted the PLRA—*e.g.*, Congress continued to permit prisoners to recover for physical injuries, the typical kinds of *Bivens* injuries." *Abbasi*, 137 S. Ct. at 1878 (Breyer, J., dissenting).

49

That assumption is borne out in the data: From 2007 to 2017, there were at least 171 cases in which a prisoner-plaintiff, proceeding under *Bivens*, obtained damages in federal court.[9] That number does not include the many instances when a prisoner proceeded with his or her claims past a motion to dismiss or summary judgment, but might have ultimately failed on the merits. Cases like Mr. Stanard's are commonplace, adjudicated by federal courts without encumbering the other branches.

*Second*, granting Mr. Stanard damages would not impair federal prison operations. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (discussing special factor). The HCV Clinical Guidance treatment has *already* changed, incorporating the very concerns that Mr. Stanard has raised. The policy now recommends "testing for HCV infection . . . for all inmates, *regardless of sentencing status*."[10] Once that testing is complete, the guidance "recommends treatment for acute HCV infection, rather than" any sort of

---

[9] James E. Pfander, Alexander A. Reinert & Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When* Bivens *Claims Succeed*, 72 STAN. L. REV. 561, 566 (2020).

[10] Fed. Bureau of Prisons, Clinical Guidance: Evaluation and Management of Chronic Hepatitis C Virus (HCV) Infection (March 2021) at 6 (hereinafter "Mar. 2021 HCV Guidance") (emphasis added).

"monitoring for spontaneous resolution over 6–12 months." Mar. 2021 HCV Guidance at 12.

The update provides antiviral "treatment if continuity of care can be reasonably assured and there is reliably sufficient time remaining in custody to complete treatment." *Id.* at 13. By incorporating testing for all inmates and recommending treatment for nearly everyone, this policy change both reduces the potential for additional future litigation and answers any argument that Mr. Stanard is seeking to change it. Resolving Mr. Stanard's claims does not require an exhaustive investigation into BOP operations, but a particularized inquiry into the individual Defendants who failed to adhere to their legal responsibilities.

*Third*, *Bivens* itself cautioned against allowing claims to proceed that would greatly expand government liability, 403 U.S. at 396, a concern echoed by subsequent cases, *FDIC v. Meyer*, 510 U.S. 471, 486 (1994). Mr. Stanard's complaint does not present such an expansion. Rather, he has pursued the routine form of relief—a *Bivens* action—for individual redress of individual wrongdoing. Moreover, because BOP Clinical Guidance has already been updated, even if Mr. Stanard were to prevail on the merits, there is unlikely to be any significant increase in liability going forward.

*Finally*, in *Abbasi*, the Court declined to recognize a *Bivens* action by individuals detained following the September 11th attacks, citing "national security" issues. 137 S. Ct. at 1861. Similarly, in *Hernandez*, plaintiffs sought relief from a cross-border shooting by a Border Patrol agent that resulted in the death of a Mexican national. 140 S. Ct. at 739. Both cases implicated foreign nationals in consequential issues of policy. That factor is not present here: Defendants are domestic actors, with no ties to any foreign individual, country, or organization.

## B. Mr. Stanard has stated a plausible claim for relief.

As a final note, the district court determined that Mr. Stanard could not proceed because he had "fail[ed] to state a cognizable claim for relief." ER-49. It is unclear where the district court found this cognizability requirement— *Abbasi* does not mention cognizability, and neither does *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the one other case the district court cites, ER-49. What *Iqbal* requires is not cognizability, but plausibility. *See* 556 U.S. at 678 (plaintiffs must "state a claim to relief that is plausible on its face.").

Plausibility is not a high threshold. *See Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 4073760, at *1 (N.D. Cal. Aug. 24, 2021) (describing the "low bar of plausible pleading"); *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*,

973 F.3d 1022, 1034 (10th Cir. 2020) (same).  To clear this bar, Mr. Stanard must simply allege the core elements of a deliberate indifference claim.  He has done that:  He has stated (and the case law confirms) that HCV is a serious medical illness, that he suffered from it while at SeaTac, that Defendants knew of his suffering, and that Defendants denied him treatment.  That is all *Estelle*, 429 U.S. at 104–05, and this court's precedents require.

Rather than credit these allegations, however, the district court undertook a summary-judgment style like analysis into Mr. Stanard's averments.  In finding that Mr. Stanard has failed to state a claim, *every case* the district court cited arose at the summary judgment stage or later.  *See, e.g.*, *Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) (summary judgment); *Hudson v. McMillian*, 503 U.S. 1 (1992) (post-trial).  That is inappropriate at this stage of litigation, and the district court's decision to dismiss on cognizability grounds is not well founded.

## III.  THE DISTRICT COURT ERRED IN FINDING THAT MR. STANARD'S FIFTH AMENDMENT CLAIM PRESENTED A NEW *BIVENS* CONTEXT.

Together with his Eighth Amendment claim, Mr. Stanard also asserted that his "constitutional right under the equal protection clause of the 5th

amendment was violated." ER-125.[11]  Namely, "[t]here [was] no rational[] relation between the dissimilar treatment of myself as a pre-trial inmate . . . that is served by denying me Hep. C. treatment and granting it to inmates that are actually sentenced." *Id.*

The district court dismissed this claim in conclusory fashion.  It asserted that "[t]he Supreme Court has never recognized a *Bivens* remedy for Fifth Amendment equal protection claims arising in the prison context." ER-45.  It noted that such claims have been recognized by the Court only "in the context of [] employment discrimination," *id.*, per *Davis v. Passman*, 442 U.S. 228 (1979).  By that measure, Mr. Stanard's claim presented a new *Bivens* context, and—given the existence of the same alternative remedies discussed above— such a cause of action must fail.

This analysis misreads *Carlson* and overlooks the interplay between *Carlson* and *Davis*.  The relationship between these two cases was explicitly acknowledged by the Supreme Court and establishes that Mr. Stanard's Fifth

---

[11] Although the Fifth Amendment, unlike the Fourteenth Amendment, does not include an explicit equal protection clause, the "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

Amendment claim is not "different in a meaningful way from previous *Bivens* cases." *Abbasi*, 137 S. Ct. at 1859.

## A. *Carlson* involved a Fifth Amendment claim.

Start with *Carlson*. Although the district court characterizes *Carlson* as solely an Eighth Amendment case, ER-42, that is not entirely correct. The operative complaint in *Carlson* "alleged that [the inmate] died as the result of medical care so inappropriate as to evidence intentional maltreatment." *Green*, 581 F.2d at 671. Specifically, "the defendants' acts violated the Due Process Clause and the *equal protection component of the Fifth Amendment* in addition to the Eighth Amendment's prohibition against cruel and unusual punishment." *Id.* (emphasis added). When presented with these two claims— the very same constitutional claims at issue here—the Seventh Circuit concluded that plaintiff could seek *Bivens* relief through both. *Id.* at 673.

As to the Fifth Amendment equal protection claim, the Seventh Circuit observed that "[n]umerous courts have extended the rationale of *Bivens* to other types of claims." *Green*, 581 F.2d at 673 (citing *Jacobson v. Tahoe Reg'l Plan. Agency*, 566 F.2d 1353, 1364, n.23 (9th Cir. 1977) and decisions from the Fourth and the Fifth Circuits that had "extended the rationale of *Bivens*" to cover Fifth Amendment claims).

Tellingly, the Seventh Circuit's equal protection ruling was so uncontroversial that the Department of Justice did not even challenge it when appealing to the Supreme Court. Instead, the questions presented in the certiorari petition focused entirely on "[w]hether the Eighth Amendment gives rise to an implied cause of action," and whether "such a right" survives under "federal common law." Cert. Br., *Carlson v. Green*, 446 U.S. 14 (1980), 1979 WL 213535, at *2.

That posture did not go unnoticed. As respondent remarked in opposition, "[a]lthough totally ignored by the defendant's brief, Count III of plaintiff's claim alleges that . . . he was denied basic humane medical treatment . . . on the basis of race, in violation of the equal protection component of the Fifth Amendment." Br. for Resp., *Carlson v. Green*, 446 U.S. 14 (1980), 1979 WL 213534, at *10 n.4.

In reply, the Department of Justice contended that the FTCA "appears to afford a remedy for respondent's particular equal protection claim." Reply Br. for Pet'rs, *Carlson v. Green*, 446 U.S. 14 (1980) (No. 78-1261), 1980 WL 371715, at *5 n.4. "Of course, if [such] an alleged constitutional tort does not fall within the scope of a federal remedial statute, *then recognition of a* Bivens-

*type action would ordinarily he [sic] appropriate.*" *Id.* (citing *Davis v. Pass-man*, 442 U.S. 228 (1979)) (emphasis added).

Even though the Department of Justice did not formally request review on the Fifth Amendment issue, the Supreme Court was more than aware that plaintiff had asserted such a claim. As it explained, "[t]he complaint . . . alleges . . . that petitioners were deliberately indifferent to [the inmate's] serious medical needs"—i.e., in violation of the Eighth Amendment—*and* "that their indifference was in part attributable to racial prejudice"—i.e., in violation of the Fifth Amendment. *Carlson*, 446 U.S. at 16 n.1.

This posture sets the table for Mr. Stanard's claim. Just like the inmate in *Carlson*, Mr. Stanard was detained in a federal prison. Just like the inmate in *Carlson*, Mr. Stanard alleges that Defendants here were "deliberately indifferent to [his] serious medical needs," *Carlson*, 446 U.S. at 16 n.1, in violation of the Eighth Amendment, *and* that Defendants ran afoul of the Fifth Amendment's equal protection clause in denying him medical treatment based on an improper classification, *id.*; *see also Green*, 581 F.2d at 671. And just like the inmate in *Carlson*, both claims—under the Fifth Amendment and Eighth Amendment—should be allowed to go forward.

### B. *Davis* involved a Fifth Amendment claim.

If *Carlson*, standing alone, does not clearly define the contours of Mr. Stanard's Fifth Amendment claim, *Davis v. Passman*, 442 U.S. 228 (1979), answers any lingering doubt. *Davis* involved gender discrimination by a then-Congressman against his former administrative assistant. *Id.* at 230. Plaintiff sought relief under "[t]he equal protection component of the Due Process Clause." *Id.* at 235.

In holding that plaintiff in *Davis* could proceed with "a damages remedy . . . directly under the Constitution," *id.* at 230, the Supreme Court held that "she ha[d] no effective means other than the judiciary to vindicate [her] rights." *Id.* at 243. "We conclude, therefore, that she is an appropriate party to invoke the general federal-question jurisdiction of the District Court to seek relief," and "has a cause of action under the Fifth Amendment." *Id.* at 244.

In reaching this determination—that plaintiff could proceed with her equal protection claim—the Court explained that "[f]ive Courts of Appeals have implied causes of action directly under the Fifth Amendment." *Id.* at 244 n.22. The Court cited, among other cases, the Ninth Circuit's decision in *Jacobson* and the Seventh Circuit's decision in *Carlson*. *Id.* *Davis*, in short, embraced *Carlson* and explicitly drew upon it in reaching its final conclusion.

Thus, although the Supreme Court did not say it in so many words, it did implicitly recognize that prisoners could proceed with an equal protection claim under a *Bivens* theory. It recognized it in *Carlson*, as reflected in the Department of Justice's reply brief and the Court's resulting decision. And it acknowledged it further in *Davis*, when the Court cited favorably to *Carlson* in extending *Bivens* to Fifth Amendment equal protection claims.

### C. The *Abbasi* factors establish that this case falls well within the contours of *Carlson* and *Davis*.

The *Abbasi* factors highlight the interplay between *Carlson* and *Davis*, and confirm that Mr. Stanard's Fifth Amendment claim is not "different in a meaningful way from previous *Bivens* cases." *Abbasi*, 137 S. Ct. at 1859. The first factor—the rank and file of the officers involved—repeats the analysis above. *Carlson* named as Defendants various prison medical officials, supervisors, and administrators, and Mr. Stanard has done the same. Factor two, the constitutional provisions at issue, is likewise straightforward: plaintiff in *Carlson* brought an equal protection claim under the Fifth Amendment, as did plaintiff in *Davis*, and as has Mr. Stanard.

Factors three and four, concerning the nature of the official action and the statutory mandate under which the official was operating, tips in Mr. Stanard's favor. Defendants have made clear that, having not been sentenced,

Mr. Stanard was a "pre-trial inmate" and, as such, was categorically prohibited from receiving antiviral treatment. *See, e.g.*, ER-131 (Defendant Sproul); ER-127 (Defendant Dy). But such claims are not well taken.

For one, BOP policy—then and now—does not categorically exclude *any* inmate from care. Rather, the policy makes clear that, whatever the general guidelines might say, an official must still conduct a specific assessment into treatment needs.

Moreover, as the district court pointed out, the case law dictates "that a convicted but not yet sentenced inmate should be treated as a sentenced inmate." ER-44 (citing *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000)). That determination has been established across multiple circuits over multiple decades. *See* ER-43–44 (citing *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 957 (8th Cir. 1994); *Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990); *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)). Whatever BOP policy might say—and it does not, to be clear, say what Defendants want it to—such policy cannot trump governing precedent.

Factor five, the availability of judicial guidance, cuts a similar path. This court is more than capable of handling equal protection claims. *See, e.g.*, *Roy v. Barr*, 960 F.3d 1175, 1181–84 (9th Cir. 2020) (examining equal protection

claim through gender discrimination and legitimacy discrimination lens). That includes equal protection claims by federal prisoners and criminal defendants. *See United States v. Sahhar*, 917 F.2d 1197, 1204 (9th Cir. 1990) (examining equal protection claim for civil commitment of defendants); *United States v. Avendano-Camacho*, 786 F.2d 1392, 1394–95 (9th Cir. 1986) (Kennedy, J.) (examining equal protection claim for "the different periods provided the government and criminal defendants for filing an appeal.").

And when it comes to the specific claim Mr. Stanard seeks to pursue—the disparate treatment between those who are classified as pretrial detainees and those that have been sentenced—there is a wide body of case law on which a federal court may draw upon. *See, e.g.*, *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (analyzing claims by pretrial detainees and posttrial inmates); *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1457 (9th Cir. 1991) (same); *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003) (same); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

The final factor, the risk of disruptive intrusion, weighs in Mr. Stanard's balance as well. As has been covered, prison civil rights litigation falls well within the core of *Bivens* actions. That has been the case for over forty years. Neither this court nor the Supreme Court has determined that such litigation,

especially as it pertains to the individual acts of individual officers, unduly disrupts the functioning of the correctional system.

## IV. EVEN IF MR. STANARD'S FIFTH AMENDMENT CLAIM ARISES IN A NEW *BIVENS* CONTEXT, IT CONSTITUTES A WELL-SUPPORTED EXTENSION OF *CARLSON* AND *DAVIS*.

If the court were disinclined to situate Mr. Stanard's Fifth Amendment claim within the context of *Carlson* and *Davis*, his claim would at most be merely a modest extension of the holdings in both cases.

Like *Carlson*, Mr. Stanard's claims arise in the prison context, and concern deprivation of medical coverage. Courts have reviewed such claims for decades—these causes of action are the bread and butter of prisoner *Bivens* lawsuits. Like *Davis*, Mr. Stanard's case implicates "the equal protection component of the Due Process Clause," which "confers on" him a "federal constitutional right to be free from . . . discrimination." *Davis*, 442 U.S. at 235 (footnote omitted). And for reasons already discussed, there "exist[] [no] alternative remedies" that would caution against such a modest extension. *Abbasi*, 137 S. Ct. at 1865.

Likewise, as for "special factors," *id.* at 1864, the discussion as to Mr. Stanard's Eighth Amendment claim applies with equal force to his Fifth

Amendment claim. This claim, just like his Eighth Amendment claim, does not impair BOP operations; does not involve an enormous financial burden; and focuses on the behavior of the individual Defendants, rather than an entire organization.

There is an even more important wrinkle to Mr. Stanard's Fifth Amendment claim worth highlighting. Of all the special factors, the most "central to [the] analysis are separation-of-powers principles." *Hernandez*, 140 S. Ct. at 743 (internal quotation marks omitted) (alteration added). And that factor arguably tips even more strongly in Mr. Stanard's favor when juxtaposed against the facts in *Davis*.

In *Davis*, no Justice—from the majority or the three dissents—questioned whether plaintiff's Fifth Amendment rights had been violated. Rather, the focus of the dissents was whether, in allowing an implied cause of action, the Court was infringing on separation of powers. As Chief Justice Burger remarked, "Congress has historically treated its employees differently from the arrangements for other Government employees," since "staffs of Members have been considered so intimately a part of the policymaking and political process." 442 U.S. at 249 (Burger, C.J., dissenting).

Justice Berger "categorically reject[ed] the notion that courts have any such power in relation to the Congress." *Id.* at 250–51; *accord id.* at 251 ("[R]espondent's alleged conduct [may have been] within the immunity of the Speech and Debate Clause") (Stewart, J., dissenting); *id.* at 253 ("Among those policies that a court certainly should consider in deciding whether to imply a constitutional right of action is that of comity toward an equal and coordinate branch of government.") (Powell, J., dissenting).

The dissenting Justices in *Davis* were, put another way, wary about allowing an equal protection claim to proceed precisely *because of the context in which such a claim arose*: the halls of Congress. An implied cause of action under these circumstances would inherently touch on "separation-of-powers principles." *Hernandez*, 140 S. Ct. at 743.

But those concerns are greatly diminished when comparing *Davis* against the facts here. Mr. Stanard's claim arises in the prison context, as to rank-and-file prison officials, in the administration of his medical care. These sorts of claims are commonplace, and there is little indication that allowing *this* specific Fifth Amendment claim to go forward would disrupt the separation-of-powers calculus. Indeed, few circumstances lie more at the crux of a *Bivens* action than that of a federal prisoner seeking redress for an official's

individual failure to provide constitutionally adequate medical care. That is precisely what Mr. Stanard seeks to do. The district court's order dismissing his claims was improper and should be reversed.

## CONCLUSION

For the foregoing reasons, the district court's order should be reversed.

Respectfully submitted,

By: /s/ Xiao Wang

XIAO WANG
MATTHEW DICKEL*
TAYLOR HOFFMAN*
ELISABETH LOGAN*
BRIANA SINGSON*
NORTHWESTERN UNIVERSITY
PRITZKER SCHOOL OF LAW
APPELLATE ADVOCACY CENTER
BLUHM LEGAL CLINIC
   *375 E. Chicago Avenue*
   *Chicago, IL 60611*
   *(312) 503-1486*
   *x.wang@law.northwestern.edu*

SAMUEL WEISS
OREN NIMNI
RIGHTS BEHIND BARS
   *416 Florida Avenue NW*
   *Suite 26152*
   *Washington, DC 20001*

*Counsel for Petitioner-Appellant*

*\* Law student, appearing on brief pursuant to Circuit Rule 46-4.*

JANUARY 18, 2022

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Petitioner is not currently aware of cases that raise "the same or closely related issues" within the meaning of Circuit Rule 28-2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-35582

I am the attorney or self-represented party.

**This brief contains** | 13,220 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [              ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Xiao Wang | **Date** | Jan 18, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I, Xiao Wang, counsel for Petitioner-Appellant, certify that, on January 18, 2022, a copy of the attached opening brief and excerpts of record was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/ Xiao Wang
XIAO WANG

DATED: JANUARY 18, 2022