No. 21-35582
[NO. 2:19-cv-01400-RSM, USDC, W.D. Washington]

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

_____

ROBERT A. STANARD,

Plaintiff-Appellant,

v.

MARIA DY, et al.,

Defendants-Appellees.

_____

**ANSWERING BRIEF OF UNITED STATES**

_____

Appeal from the United States District Court
for the Western District of Washington at Seattle
The Honorable Ricardo S. Martinez
United States District Judge

_____

NICHOLAS W. BROWN
United States Attorney
Western District of Washington

TANIA M. CULBERTSON
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................iv

INTRODUCTION ...................................................................................... 1

ISSUES ON APPEAL .............................................................................. 3

I.     Whether the judicially implied *Bivens* damages remedy should be extended to Stanard's Fifth and Eighth Amendment claims against the defendants; and ................................ 3

II.    Whether Stanard failed to allege a Fifth or Eighth Amendment violation. ....................................................................... 3

STATEMENT OF JURISDICTION .......................................................... 3

STATEMENT OF THE CASE .................................................................. 4

I.     Statutory and regulatory background ............................................. 4

II.    BOP's Clinical Guidance for chronic HCV ..................................... 5

III.   Factual background and Stanard's allegations .............................. 8

     A.    Stanard is held at FDC SeaTac and, after first refusing HCV treatment, pursues it via the administrative remedy program ............................................ 8

     B.    Stanard files a *Bivens* action, and the district court dismisses it ........................................................................ 15

SUMMARY OF ARGUMENT ..............................................22

STANDARD OF REVIEW..................................................25

ARGUMENT ..................................................................26

I.   The judicially inferred damages remedy of *Bivens*
     should not be extended to Stanard's Fifth and Eighth
     Amendment claims..................................................26

     A.   The Supreme Court's decisions in *Abbasi* and
          *Hernandez* reaffirm that the extension of *Bivens* to
          new contexts is disfavored ................................26

     B.   Stanard's claims present new *Bivens* contexts....................30

          1.   Stanard's Eighth Amendment claim rests
               on different factual circumstances than
               *Carlson* and implicates prison medical
               policy rather than treatment decisions that
               were deliberately indifferent to the plaintiff
               individually ..............................................30

               a.   Stanard's claim is unlike *Carlson*......................30

               b.   Stanard has shifted his argument on
                    appeal ..............................................33

               c.   Stanard's       allegations     are     also
                    meaningfully different from the other
                    cases he cites......................................36

          2.   Stanard's Fifth Amendment equal-
               protection claim is even further afield from
               *Davis*, and his argument that it derives
               from the "interplay" between *Davis* and
               *Carlson* is wrong .......................................40

a. *Carlson* does not support Stanard's Fifth Amendment claim .................................. 41

b. *Davis* also does not support Stanard's Fifth Amendment claim .................................. 44

C. Alternative remedies and other special factors counsel against extending a *Bivens* remedy to Stanard's claims .................................. 49

1. Stanard had alternative methods to pursue his desired treatment .................................. 50

2. Other special factors counsel hesitation, including Congress's delegation of authority to BOP to care for inmates and its refusal to create a damages remedy for cases like this one .................................. 54

a. The Court should not unduly intrude into prison administration .................................. 55

b. Congress has refused to create a damages remedy for cases like Stanard's .................................. 59

II. Stanard failed to plausibly allege claims for Eighth Amendment deliberate-indifference and Fifth Amendment equal-protection violations .................................. 62

CONCLUSION .................................. 66

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASE

# TABLE OF AUTHORITIES

## Supreme Court Cases

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ............................................................... 27

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................ 26, 49

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
    403 U.S. 388 (1971) ..................................................... passim

*Carlson v. Green,*
    446 U.S. 14 (1980) ....................................................... passim

*City of Cleburne v. Cleburne Living Center,*
    473 U.S. 432 (1985) ............................................................... 66

*City of Revere v. Massachusetts General Hospital,*
    463 U.S. 239 (1983) ............................................................... 48

*Correctional Services Corp. v. Malesko,*
    534 U.S. 61 (2001) ....................................................... passim

*Davis v. Passman,*
    442 U.S. 228 (1979) ..................................................... passim

*Estelle v. Gamble,*
    429 U.S. 97 (1976) .............................................. 18, 41, 65

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ........................................................ 18, 21

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) .................................................. passim

*Laird v. Tatum,*
  408 U.S. 1 (1972)................................................................56

*Mullinex v. Luna,*
  577 U.S. 7 (2015)................................................................39

*Porter v. Nussle,*
  534 U.S. 516 (2002)......................................................60, 61

*Schweiker v. Chilicky,*
  487 U.S. 412 (1988)......................................................50, 51

*Turner v. Safley,*
  482 U.S. 78 (1987)............................................................55

*Wilkie v. Robbins,*
  551 U.S. 537 (2007)......................................................50, 51

*Woodford v. Ngo,*
  548 U.S. 81 (2006)...............................................60, 61, 62

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017).............................................. passim

**Circuit Court Cases**

*Colwell v. Bannister,*
  763 F.3d 1060 (9th Cir. 2014)..........................................63

*Frost v. Agnos,*
  152 F.3d 1124 (9th Cir. 1998)..........................................47

*Gallinger v. Becerra,*
  898 F.3d 1012 (9th Cir. 2018)..........................................25

*Gillespie v. Civiletti,*
  629 F.2d 637 (9th Cir. 1980)......................................36, 37

*Gordon v. County of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ............................................ 18

*Green v. Carlson*,
    581 F.2d 669 (7th Cir. 1978) ................................... 19, 32, 41

*Hamby v. Hammond*,
    821 F.3d 1085 (9th Cir. 2016) ............................................ 64

*Hoffman v. Preston*,
    26 F.4th 1059 (9th Cir. 2022) ................................... passim

*Inmates of Suffolk County Jail v. Rouse*,
    129 F.3d 649 (1st Cir. 1997) ............................................ 60

*Ioane v. Hodges*,
    939 F.3d 945 (9th Cir. 2018) ............................................ 39

*Koprowski v. Baker*,
    822 F.3d 248 (6th Cir. 2016) ............................................ 39

*Kroessler v. CVS Health Corp.*,
    977 F.3d 803 (9th Cir. 2020) ............................................ 62

*Martinez v. Ylst*,
    951 F.2d 1153 (9th Cir. 1991) ............................................ 22

*McRae v. Dikran*,
    776 F. App'x 412 (9th Cir. 2019) ................................... 37, 38

*Oregon Advocacy Center v. Mink*,
    322 F.3d 1101 (9th Cir. 2003) ............................................ 47

*Ortiz v. Webster*,
    655 F.3d 731 (7th Cir. 2011) ............................................ 38

*Redman v. County of San Diego,*
    942 F.2d 1435 (9th Cir. 1991) (en banc) ............................................ 47

*Reeb v. Thomas,*
    636 F.3d 1224 (9th Cir. 2011) ............................................................. 53

*Reid v. United States,*
    825 F. App'x 442 (9th Cir. 2020) ........................................................ 58

*Toguchi v. Chung,*
    391 F.3d 1051 (9th Cir. 2004) ............................................................. 64

*United States v. Padilla-Diaz,*
    862 F.3d 856 (9th Cir. 2017) ......................................................... 65, 66

*Vega v. United States,*
    881 F.3d 1146 (9th Cir. 2018) ................................................... passim

*Western Radio Services Co. v. United States Forest Service,*
    578 F.3d 1116 (9th Cir. 2009) ............................................................. 53

*Zavala v. Rios,*
    721 F. App'x 720 (9th Cir. 2018)
    *cert. denied*, 139 S. Ct. 464 (2018) .................................................... 59

## District Court Cases

*United States v. Stanard,*
    No. 2:16-cr-00320 (W.D. Wash. Nov 10, 2016) ................................... 8

## Federal Statutes

Title 18, UNITED STATES CODE,
    Section 922(g)(1) ................................................................................... 8
    Section 3626(a) ..................................................................................... 52
    Section 4001(b)(1) ................................................................................. 4
    Section 4042(a)(2) ........................................................................... 4, 55

Title 28, UNITED STATES CODE,
  Section 1291 ...........................................................................4
  Section 1331 ...........................................................................3

Title 42, UNITED STATES CODE,
  Section 1983 .........................................................................59
  Section 1997e(a) ....................................................................5

**Federal Regulations**

Title 28, CODE OF FEDERAL REGULATIONS,
  Section 542.10(a) .............................................................5, 51
  Section 542.13(a) ...................................................................5
  Section 542.14 ........................................................................5
  Section 542.15(a) ...................................................................5
  Section 542.18 ........................................................................5
  Section 549.10 ........................................................................4

## INTRODUCTION

Appellant Robert A. Stanard used to have a chronic Hepatitis C (HCV) infection. He was first diagnosed in 2009. In 2016, when he was detained at FDC SeaTac while awaiting trial, he refused treatment for the infection for more than 16 months. Then, after he was convicted but before he was sentenced and transferred to FCI Sheridan, Stanard changed his mind and asked to be treated with direct-acting antiviral medications.

In response, treatment providers and other Bureau of Prisons (BOP) officials compared the results of the testing and other medical assessments Stanard received at FDC SeaTac with BOP's then-applicable Clinical Guidance for treating HCV. At the time he asked for treatment, the results of Stanard's recent blood tests did not show liver damage to any significant degree, his medical records described no clinical indications of liver damage, and he did not otherwise show signs of a compelling or urgent need for immediate treatment. Coupled with his status as a holdover detainee, this placed Stanard in the lowest priority level for HCV treatment under the Clinical Guidance. All of Stanard's treatment providers and all of the federal officials who

reviewed his requests thus concluded that Stanard could wait to begin his requested treatment regimen until he was transferred from the detention center to a prison for sentenced inmates.

After Stanard was designated to serve his sentence at FCI Sheridan, he was assessed again under BOP's recently updated HCV Clinical Guidelines, treated with direct-acting antiviral medications, and cured of his HCV infection. Nevertheless, Stanard sued under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), demanding $50 million in damages for the approximately eight months that passed between his first request for treatment and when his treatment began.

Stanard alleged *Bivens* claims under the equal protection component of the Fifth Amendment's Due Process Clause and under the Fifth and Eighth Amendments for failure to treat, and deliberate indifference to, his medical needs. The district court, following the analysis set out in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), ruled that Stanard's claims arose in a new *Bivens* context because he was challenging BOP's treatment policies rather than the kinds of fatal treatment errors committed in *Carlson v. Green*, 446 U.S. 14 (1980), or

the gender-based employment discrimination alleged in *Davis v. Passman*, 442 U.S. 228 (1979). Because Stanard had alternative remedies available to him, the district court declined to extend *Bivens* to cover his claims. The court also concluded, in the alternative, that Stanard failed to state a claim for deliberate indifference to a serious medical need under the Eighth Amendment.

On appeal, Stanard argues that a *Bivens* remedy should be available for his Fifth and Eighth Amendment claims. He also argues that the district court erred by concluding he had failed to plausibly allege an Eighth Amendment claim. His contentions lack merit.

## ISSUES ON APPEAL

I.   Whether the judicially implied *Bivens* damages remedy should be extended to Stanard's Fifth and Eighth Amendment claims against the defendants; and

II.  Whether Stanard failed to allege a Fifth or Eighth Amendment violation.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Stanard's complaint under 28 U.S.C. § 1331. The district court dismissed the action and entered judgment on July 1, 2021. ER-3–4. Stanard filed a timely notice of appeal

on July 19, 2021. ER-206. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

### I. Statutory and regulatory background

Congress has directed that "[t]he control and management of Federal penal and correctional institutions . . . shall be vested in the Attorney General, who shall promulgate rules for the government thereof." 18 U.S.C. § 4001(b)(1). Congress has further delegated broad authority to the BOP, under the direction of the Attorney General, to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2).

Under this congressionally delegated authority, BOP has issued regulations and program statements governing the provision of medical services to inmates, including a program statement governing the effective delivery of medically necessary health care. *See* 28 C.F.R. § 549.10 *et seq.*; Fed. Bureau of Prisons, U.S. Dept' of Justice, Program Statement 6031.04, *Patient Care* (issued June 3, 2014) ("Program Statement 6031.04"); SER-81. It also has set Clinical Guidance for the evaluation and management of many infectious diseases including HCV.

4

At issue here are the January 2018 and August 2018 versions of the BOP's Clinical Guidance for chronic HCV infection.

BOP has also established an administrative process that "allow[s] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10(a); *see generally id.* pt. 542. With exceptions not relevant here, a federal inmate must first seek informal resolution of the issue by prison staff. *Id.* § 542.13(a). If dissatisfied with the informal process, the inmate can file a written Administrative Remedy Request with the warden. *Id.* § 542.14. The warden has 20 days to respond, and the inmate then can file an appeal with the Regional Director and, if dissatisfied with that response, with the General Counsel. *Id.* §§ 542.15(a), 542.18. After these procedures are exhausted, a prisoner may file suit in district court. 42 U.S.C. § 1997e(a).

## II.    BOP's Clinical Guidance for chronic HCV

The BOP's January 2018 Clinical Guidance (in effect when Stanard first sought treatment at FDC SeaTac) recommended HCV testing of all sentenced inmates, all inmates with certain clinical conditions, and all inmates who asked for testing. SER-11. It also advised that "in order to select the most appropriate treatment regimen, prioritize inmates for

treatment of HCV, and determine the need for additional health care interventions," all inmates with HCV infection should be assessed for advanced fibrosis and cirrhosis.[1] SER-15. The AST to Platelet Ratio Index (APRI) was (and still is) "the BOP-preferred method for non-invasive assessment of hepatic fibrosis and cirrhosis."[2] *Id.*

The January 2018 Guidance outlined three priority levels for treatment because, while "all patients with chronic HCV infection may benefit from treatment, certain cases are at higher risk for complications or disease progression and require more urgent consideration for treatment." SER-17. Inmates with advanced liver fibrosis—as shown by an APRI equal to or greater than 2.0, liver biopsy results, or known

---

[1] Cirrhosis "is a condition of chronic liver disease marked by inflammation, degeneration of [liver cells], and replacement with fibrotic scar tissue." SER-14. "Progression of chronic HCV infection to fibrosis and cirrhosis may take years in some patients and decades in others—or, in some cases, may not occur at all." *Id.*

[2] "The APRI score, a calculation based on results from two blood tests—the AST (aspartate aminotransferase) and the platelet count—is a less invasive and less expensive means of assessing fibrosis than a liver biopsy. . . . An APRI score $\geq 2.0$ may be used to predict the presence of cirrhosis. . . . The APRI may also be used to predict the presence of significant fibrosis . . . [u]sing a cutoff of $\geq 0.7$." *Id.*

cirrhosis—were Priority Level 1 (high priority for treatment).[3] *Id.* Inmates were considered Priority Level 2 (intermediate priority for treatment) with evidence of progressive fibrosis shown by an APRI score equal to or greater than 0.7 or Stage 2 fibrosis on liver biopsy. SER-18. Inmates with an APRI of less than 0.7 or stage 0 to stage 1 fibrosis on liver biopsy were considered Level 3 (low priority for treatment). *Id.* The Guidance contemplated exceptions to the priority system on an "individual basis" where "evidence for rapid progression of fibrosis, or deteriorating health status from other comorbidities" showed a "compelling or urgent need for treatment." SER-14. The Guidance described various direct-acting antiviral treatment regimens, *see* SER-19–23, but recommended that along with meeting the priority-level criteria, "inmates being considered for treatment of HCV infection should . . . [h]ave sufficient time remaining on their sentences in the BOP to complete a course of treatment," SER-18.

---

[3] Other Level 1 criterion included receipt of a liver transplant, a diagnosis of primary liver cancer, the use of immunosuppressant medications for a comorbid medical condition, and continuity of care for inmates already started on treatment. *Id.* There is no indication that Stanard met any of these criteria.

In August 2018, BOP released updated Clinical Guidance for chronic HCV. *See* SER-43. The update recommended "opt-out voluntary testing of all inmates for HCV infection, regardless of sentencing status," and explained that "[a]ll sentenced inmates are eligible for consideration of treatment for chronic HCV infection." SER-44. But, the Guidance noted, "BOP Priority Criteria have been retained as a guide for deciding whom to treat first," and those criteria remained virtually unchanged. *Id.*; *see also* SER-54–55. "Long-term, pre-sentence detainees in BOP custody" also could be considered for treatment if they presented "with high priority criteria," but only if "continuity of care [could] be reasonably assured and there [wa]s reliably sufficient time remaining in custody to complete treatment." SER-55.

## III. Factual background and Stanard's allegations

### A. *Stanard is held at FDC SeaTac and, after first refusing HCV treatment, pursues it via the administrative remedy program*

In November 2016, Stanard was arrested for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). CR-4; *United States v. Stanard*, No. 2:16-cr-00320 (W.D. Wash. Nov. 10, 2016). He was detained at FDC SeaTac pending trial. CR-8. According to Stanard, he

was evaluated by Dr. Maria Dy when he arrived at FDC SeaTac, and they talked about his preexisting chronic HCV. ER-69. Although Dr. Dy discussed "possible treatment at that time," Stanard "refused any and all forms of medical and professional help." ER-69–70.

In January 2018, a jury convicted Stanard of being a felon in possession of a firearm and ammunition, for possession of an unregistered firearm, and for conspiracy to obstruct justice. CR-118. Six months later, the district court sentenced Stanard to 84 months in prison followed by three years of supervised release. CR-155. He stayed at FDC SeaTac until late September 2018, when he was designated and transferred to FCI Sheridan. ER-135.

In March 2018—two months after his conviction but before he was sentenced—Stanard asked for the first time to receive HCV treatment at FDC SeaTac. ER-70, 121–22. On March 2 and April 4, he submitted BP-8 (informal resolution) forms asking for treatment. ER-130, 175. Stanard's April 4 BP-8 states he emailed Dr. Dy requesting treatment,

but she told him, "You are not qualified for Hep C treatment at this time based on the lab test result on 1/2/18."[4] ER-175.

Stanard received a response to his BP-8 requests on May 13, explaining that he was "a treatment Priority Level 3 and a pre-trial inmate" and that BOP was "currently focusing on treating designated Priority 1 & 2 Level inmates." ER-175. The response also stated that Stanard would "continue to be monitored accordingly." *Id.*

Stanard then submitted a BP-9 (a formal request for an administrative remedy) to FDC SeaTac's warden, Dan Sproul. ER-177–79. Stanard claimed deliberate indifference to his serious medical needs because BOP's response to his request for HCV treatment was that he "d[id]n't qualify due to BOP policy." ER-179.

The warden responded to Stanard's BP-9 within four days of receiving it, explaining that "according to your Health Services records, you are currently a treatment Priority Level 3 and a pre-trial inmate."

---

[4] Stanard's amended complaint also alleges he spoke to "Mrs. McDermont," whom he states was FDC SeaTac's Health Services Administrator. ER-122, 127. According to Stanard, Mrs. McDermont told him he would not receive any HCV treatment at FDC SeaTac because he was "a pre-trial inmate" and because his "APRI [l]evels are not within the required range to receive treatment." ER-127.

ER-180. Because the BOP was "currently focusing on treating Priority Level 1 & 2 level inmates," the warden told Stanard he would "continue to be monitored closely by Health Services staff" and he could address "any further concerns on this issue" by "submit[ting] a cop-out to Medical." *Id.*

Stanard appealed the warden's denial of his BP-9 to the BOP's Western Regional Director, Juan Baltazar. ER-183. Stanard stated he was "becoming easily fatigued" and was "experiencing periods of abdominal bloating . . . accompanied with varying degrees of pain" that "typically only last a day or so" and resolved before he could "be seen for sick call." *Id.* Although none of the responses to his earlier administrative requests mentioned cost, Stanard apparently believed that the BOP was withholding HCV treatment because of cost; in his BP-10 to Baltazar he wrote: "Budgetary constraints should not preclude me or anyone else from receiving adequate treatment that provides a better quality of life." ER-182.

While Stanard waited for a response to his BP-10, two things changed: first, as noted above, in August 2018 the BOP updated its HCV Clinical Guidance (*see* SER-43); and second, Stanard was transferred to

FCI Sheridan on September 28, 2018 (*see* ER-139, 185). There, after evaluation by a BOP doctor on November 14, new lab tests were ordered so that Stanard could begin HCV treatment. Stanard's complaint does not say when he began treatment, but it does acknowledge that by the end of May 2019 he had completed an 8-week course of treatment with a direct-acting antiviral and that his HCV infection was at undetectable levels five-and-a-half weeks into the treatment. ER-137.

But in the meantime, days after arriving at FCI Sheridan, Stanard submitted a central office administrative remedy appeal (a BP-11) to Ian Connors, Administrator of National Inmate Appeals. ER-189–91. There, Stanard explained that the medical department at FDC SeaTac was deliberately indifferent to his medical needs "[d]ue to the [BOP]'s policy and criteria for treatment and care of inmates with a diagnosis of chronic Hep. C" and that "this policy or criteria is the moving force behind the constitutional violations." ER-191.

Ian Connors responded to Stanard's BP-11 on November 13 (the day before Stanard's appointment at FCI Sheridan to initiate HCV treatment). *See* ER-185–86, 193. He wrote that although "BOP expanded access to HCV treatment to all sentenced inmates in August 2018," BOP

"institutions may continue to use the priority level system to prioritize their patients." ER-192. Connors also set out the various criteria used in determining priority levels, including that "[h]ighest priority for treatment is based on evidence of advanced liver fibrosis" and "[i]ntermediate priority for treatment is based on evidence for progressive fibrosis, and certain comorbid medical conditions." *Id.*

Connors then discussed the information in Stanard's medical record relevant to determining whether he was developing liver fibrosis. Starting with the results of BOP testing done when Stanard was serving a sentence for an earlier conviction, Connors explained that although Stanard had chronic HCV, a liver ultrasound from May 2009 was normal and a liver biopsy from July 2009 showed no tissue damage. *Id.* Connors then noted that Stanard's medical records reflected "no clinical indication of advanced fibrosis"—that is, no reported signs or symptoms—and that his APRI "is less than 2.0 and 1.0," meaning he was "not at highest risk for progression of liver disease" and did "not meet priority 1 or 2 treatment criteria at this time." *Id.* Staff would "continue to monitor [Stanard's] case in chronic care clinic according to the Hepatitis C

Clinical Practice Guidelines, with adjustments to [his] treatment plan as clinically indicated." *Id.*

Juan Baltazar responded to Stanard's BP-10 a month later. ER-185–86. Baltazar's response showed he had reviewed Stanard's up-to-date medical record because it discussed his transfer to FCI Sheridan, his new lab tests, and his recent placement on a list for "follow-up evaluation for Hepatitis C treatment." ER-185. Baltazar stated—contrary to what Stanard apparently believed—that "[b]udgetary factors do not contribute to the screening process and do not determine an inmate's eligibility for a specific treatment." *Id.* He explained that the recommendations for managing HCV both in and outside the prison setting "continue to undergo rapid change in order to incorporate the best clinical evidence available." *Id.* BOP's priority criteria for HCV treatment are in place to "ensure that those with the greatest need are identified and treated first." *Id.*

Baltazar also discussed Program Statement 6031.04, governing BOP's delivery of medically necessary health care. ER-185; SER-81. He explained that "[o]rdinarily, pretrial or non-sentenced inmates, and inmates with less than 12 months to serve, are ineligible for" elective

procedures, limited-medical-value procedures, and extraordinary or investigational interventions. *Id.* Thus, he pointed out, BOP's policy is to provide *medically necessary* treatment to inmates "regardless of status." *Id.* Baltazar noted that Stanard's care was ongoing, and he was "receiving appropriate care and treatment for [his] medical concerns in accordance with the Bureau of Prisons Clinical Guidelines." ER-186.

## B. *Stanard files a* Bivens *action, and the district court dismisses it*

In August 2019, four months after successfully completing his course of HCV treatment at FCI Sheridan, Stanard filed this civil rights action. ER-208. He amended his complaint in February 2020, alleging *Bivens* claims under the equal protection component of the Fifth Amendment's Due Process Clause for dissimilar treatment as a pretrial detainee, and under the Fifth and Eighth Amendments for failure to treat, and deliberate indifference to, his medical needs. ER-125. In all, Stanard sought $50 million in damages for his time at FDC SeaTac. ER-142.

Stanard's complaint names seven BOP employees as defendants: Dr. Maria Dy, a doctor at FDC SeaTac; Mrs. McDermont, Health Services Administrator at FDC SeaTac; Dan Sproul, Warden at FDC SeaTac;

Juan Baltazar, BOP's Western Regional Director; Ian Conners, BOP's Administrator of National Inmate Appeals; an unnamed BOP Medical Director; and an unnamed Regional Medical Director. Stanard specifically alleges that the defendants relied on BOP policy in denying him treatment. *See, e.g.*, ER-122 (alleging Dr. Dy "relied upon Bureau policy and set criteria to deny treatment when it would have only taken twelve weeks to complete"), ER-123 (alleging Juan Baltazar "relied upon a flawed policy to back up institutional staff in denying the Plaintiff proper medical treatment"), ER-124 (Ian Connors allegedly "relied upon Medical Directors description of the Clinical Practice Guidelines to refuse a viable treatment").

The supporting allegations in the amended complaint also underscore the policy-based nature of Stanard's claims. For example, Stanard alleges that Warden Sproul "also relied upon BOP policy to support a finding of denying treatment," Juan Baltazar "relied solely upon policy in denying me an adequate treatment to a serious medical need," and Ian Connors "relied on outdated and inadequate medical records" but also "relied upon Official BOP Policy and Program Statements" in concluding that Stanard did not meet BOP "treatment

criteria." ER-128–29. *See also* ER-134 (Mrs. McDermont "informed me that my APRI does not meet the criteria of the [BOP]").

The defendants moved to dismiss the amended complaint. ER-100. First, the defendants explained that Stanard's constitutional claims present a new *Bivens* context under the framework outlined in *Abbasi*. *See* ER-107–09. Second, the defendants described the alternative remedies available to address Stanard's claims. *See* ER 109–11. Third, the defendants discussed other special factors counseling hesitation in expanding *Bivens* to provide a damages remedy against individual federal employees. *See* ER-111–14. And finally, the defendants pointed out that Stanard failed to allege sufficient facts to state a claim of deliberate indifference, a due-process violation, or an equal-protection violation. *See* ER-114–17.

The magistrate judge recommended dismissing Stanard's complaint with prejudice. *See* ER-37. The magistrate judge chose to analyze Stanard's deliberate-indifference claim under the Eighth rather than the Fifth Amendment because Stanard had been convicted—

although not yet sentenced—by the time he asked for HCV treatment at FDC SeaTac.[5]

The magistrate judge noted that the Supreme Court recognized an implied damages remedy for an Eighth Amendment medical care claim in *Carlson v. Green*, 446 U.S. 14 (1980). ER-46. But the Court concluded that implying a *Bivens* remedy for Stanard's allegations would be an extension of Carlson because Stanard's claim was "demonstrably different." *Id.*

Stanard alleged that he was denied treatment for his HCV infection because of BOP policy that identified priority levels for treatment based on the seriousness of an inmate's disease and precluded prisoners who

---

[5] In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference under the Eighth Amendment requires "a showing that the official was subjectively aware of the risk." *Farmer v. Brennan*, 511 U.S. 825, 829 (1994). Claims for inadequate medical care brought by pretrial detainees, however, "must be evaluated under an objective deliberate indifference standard." *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (addressing a section 1983 claim under the Fourteenth Amendment). The Court need not decide whether Stanard's claim is more properly analyzed under the Fifth or the Eighth Amendment. On these facts, both present a new *Bivens* context under *Abbasi*. But because the district court analyzed Stanard's deliberate indifference claim under the Eighth Amendment standard, the United States follows suit here.

had not yet been sentenced and designated to a facility from receiving treatment. ER-47. The magistrate judge noted that Stanard was "assigned to the lowest of the three priority levels based on his APRI score," and while Stanard identified some symptoms he claimed to have suffered, "the extent to which he may have sought medical treatment to address those symptoms" was "unclear." *Id.* Thus, "unlike in *Carlson*," where a prisoner died in custody as the result of medical treatment "so clearly inadequate as to amount to a refusal to provide essential care, so inappropriate as to evidence intentional maltreatment causing death," ER-46 (quoting *Green v. Carlson*, 581 F.2d 669, 675 (7th Cir. 1978)), Stanard's allegations concerned "the application of a policy" he believed was "inequitable and/or discriminatory and prevented him from receiving the immediate medical treatment he desired." *Id.* Pointing to the "substantial difference in the factual context of the two cases," the magistrate judge concluded that Stanard's Eighth Amendment claim arose in a new *Bivens* context. ER-47–48.

The magistrate judge also concluded that Stanard's claim of differential treatment as a pretrial detainee presented a new *Bivens* context. *See* ER-45. The judge explained that the Supreme Court has

recognized a *Bivens* remedy for a Fifth Amendment equal-protection violation only in the context of employment discrimination and has never recognized such a claim in the prison context. *Id.*

The magistrate judge then considered whether "there are alternative remedies available" to Stanard or "other 'sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy.'" ER-48 (quoting *Abbasi*, 137 S. Ct. at 1865). She concluded that Stanard "had remedies available to him under the BOP's administrative remedy program" and that, because he was "effectively challenging a BOP policy, [Stanard] could have brought claims for injunctive relief outside of *Bivens*." *Id.* (citing the statement in *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001), that "unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally"). Accordingly, the magistrate judge recommended that a *Bivens* remedy should not be extended to Stanard's Fifth and Eighth Amendment claims. ER-49.

Finally, the magistrate judge determined that, even assuming Stanard could bring an Eighth Amendment *Bivens* claim for the alleged

denial of adequate medical care, he had failed to state a claim for relief. *Id.* To prove an Eighth Amendment violation, the judge explained, Stanard would have to show "(1) the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation; and (2) the prison official[s] acted with a sufficiently culpable state of mind." *Id.* (quoting *Farmer*, 511 U.S. at 834). The allegations in Stanard's amended complaint were lacking on both points. ER-50–51.

Although Stanard claimed "he suffered occasional symptoms attributable to his Hepatitis C, including pain, discomfort and fatigue," he did not "allege facts demonstrating that he had a compelling or urgent need for treatment while at FDC SeaTac" and his allegations that "the delay in receiving treatment caused him harm" were "vague and conclusory at best." ER-51. As for a culpable state of mind, the complaint alleged that the defendants relied on BOP Clinical Guidance "to defer treatment temporarily," but that "is insufficient to establish deliberate indifference." *Id.* Therefore, in the alternative, the magistrate judge recommended that Stanard's Eighth Amendment claim was "subject to dismissal for failure to state a claim upon which relief may be granted." *Id.*

Stanard objected to the report and recommendation.[6] *See* ER-24–34. Reviewing de novo, the district court concluded that the magistrate judge had correctly determined that Stanard's Eighth Amendment *Bivens* claim arose in a new context given the "key factual distinctions" between Stanard's allegations and the facts in *Carlson*. ER-11. The court also agreed that "*Bivens* should not be extended to this new context based on the [available] alternative remedies." *Id.* The district court approved and adopted the report and recommendation and dismissed Stanard's suit with prejudice. ER-12.

## SUMMARY OF ARGUMENT

The Supreme Court has repeatedly cautioned that extending the *Bivens* remedy to a new context is a "'disfavored' judicial activity" that the Court "has refused to do" for almost four decades. *Ziglar v. Abbasi*,

---

[6] Stanard's six objections were directed only at the magistrate judge's resolution of his Eighth Amendment claim. *See* ER-25–33. This Court can conclude that by failing to object to the magistrate judge's resolution of his Fifth Amendment claim, Stanard forfeited the issue for appeal. *See Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991) (failure to object to a magistrate judge's finding "is a factor to be considered in determining waiver"). In any event, the district court properly dismissed the Fifth Amendment claim. *See infra* at 65–66.

137 S. Ct. 1843, 1857 (2017). The district court correctly heeded this caution and refused to extend *Bivens* to Stanard's claims.

The district court was right that Stanard's Fifth and Eighth Amendment *Bivens* claims challenging BOP's adherence to Clinical Guidance arise in a new context. And because Stanard had alternative processes available for protecting his interests and there are special factors otherwise counseling hesitation, recognizing new *Bivens* remedies here is unwarranted. This Court should affirm the district court's decision dismissing Stanard's claims.

Stanard tries to equate his case with *Carlson* and *Davis*. He does this first by recharacterizing his claims on appeal, asserting that he is challenging the defendants' failure to follow BOP's Clinical Guidance instead of their adherence to it. But taking his allegations as true, the BOP medical providers and officials each accurately applied the Clinical Guidance to determine that Stanard could wait until he was transferred out of a pretrial detention center to begin the treatment regimen he wanted. Stanard's Eighth Amendment claim, therefore, is a challenge to BOP treatment policy. Such challenges have not previously been recognized under *Bivens* and should not be recognized here.

Stanard next tries to locate his Fifth Amendment equal protection claim in the "interplay" between *Carlson* and *Davis*. But neither of those cases recognized a *Bivens* remedy for Fifth Amendment discrimination claims arising in a prison. Stanard's reliance on passing statements in 40-year-old briefing, a string-citation in the Supreme Court's pre-*Abbasi* opinion in *Davis*, and his unsupported reading of the Seventh Circuit's holding in *Carlson* do not change that fact. This Court should decline Stanard's invitation to extend a *Bivens* remedy under the Fifth Amendment to this plainly novel context.

Multiple special factors counsel hesitation in extending *Bivens* to cover Stanard's claims. Stanard had alternative remedies available to him—in fact, he used the prison administrative grievance process and ultimately received the treatment he requested. He also could have sought a declaratory judgment or even an injunction, which (as the Supreme Court and this Court have said) is the appropriate way to seek relief that affects important aspects of prison management like the policies governing prioritization of medical treatment at issue here. Because Stanard is challenging BOP's treatment policies, separation-of-powers concerns are particularly acute in this case. The Court should not

open the door to prisoner suits for individual damages against BOP employees who follow applicable BOP Clinical Guidance in providing medical care to BOP inmates. Congress has never indicated an intention for such suits to proceed under *Bivens*, and instead passed the Prison Litigation Reform Act (PLRA) in large part to eliminate unwarranted federal-court interference with the administration of prisons.

For all these reasons, this Court should affirm the district court. But even if the Court disagrees, it should affirm the district court's dismissal on the ground that Stanard failed to allege an Eighth or Fifth Amendment violation. Stanard did not plausibly allege deliberate indifference to a serious medical need or that the BOP policies governing his treatment requests lacked any legitimate penological interest.

## STANDARD OF REVIEW

This Court reviews de novo a district court's order dismissing a complaint. *Vega v. United States*, 881 F.3d 1146, 1152 (9th Cir. 2018). Although all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party, conclusory allegations of law are insufficient to defeat a motion to dismiss. *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018). If support exists in the record, this

Court may affirm a dismissal on any proper ground. *Vega*, 881 F.3d at 1152.

## ARGUMENT

### I. The judicially inferred damages remedy of *Bivens* should not be extended to Stanard's Fifth and Eighth Amendment claims

The Supreme Court's decision in *Ziglar v. Abbasi* makes clear that the continued expansion of *Bivens* to "any new context or new category of defendants" is a "disfavored judicial activity." 137 S. Ct. at 1857 (quotation marks omitted). The district court correctly applied *Abbasi* to conclude that special factors counsel against extending *Bivens* to Fifth Amendment equal-protection and Eighth Amendment medical-indifference claims challenging BOP policy governing HCV treatment priorities in prisons.

#### A. The Supreme Court's decisions in *Abbasi and Hernandez reaffirm that the extension of* Bivens *to new contexts is disfavored*

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). The Court decided *Bivens* at a time when, "as a routine matter," it "would imply causes of action not explicit in [a statute's] text"

on the assumption that courts could properly "provide such remedies as [were] necessary to make effective" the statute's purpose. *Abbasi*, 137 S. Ct. at 1855. In *Bivens*, the Court extended that approach to recognize an implied cause of action for a constitutional violation. *Id.*

The Supreme Court has long since—and repeatedly—repudiated on separation-of-powers grounds the "*ancien regime*" from which *Bivens* arose. *Abbasi*, 137 S. Ct. at 1855 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)). The Court has explained that Congress is "better position[ed]" than the judiciary "to consider if the public interest would be served by imposing a new substantive legal liability." *Id.* at 1857 (quotation marks omitted). The question whether to create such claims thus should "be committed to those who write the laws rather than those who interpret them." *Id.* (quotation marks omitted).

As a result, the expansion of *Bivens* has been "disfavored" for nearly four decades. *Abbasi*, 137 S. Ct. at 1857. Apart from *Bivens* itself, the Supreme Court has recognized a damages action under the Constitution only two other times: to redress an equal-protection violation involving discrimination in congressional-staff employment, *Davis v. Passman*, 442 U.S. 228 (1979), and an Eighth Amendment violation involving the

failure to treat an inmate's asthma that resulted in his death, *Carlson v. Green*, 446 U.S. 14 (1980). Otherwise, the Supreme Court has "consistently refused to extend *Bivens* liability" to any new contexts, including those involving prisoner detention. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *Abbasi*, 137 S. Ct. at 1857 (listing cases). "[I]n light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1856.

To protect the separation of powers from continued encroachment, *Abbasi* set forth stringent criteria under which a court may extend *Bivens*. At the threshold, courts must determine whether the asserted cause of action arises in a new context—that is, if it differs "in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 137 S. Ct. at 1859. A case can present a new context for *Bivens* purposes if "it implicates a different constitutional right . . . or if there are potential special factors that were not considered in previous *Bivens* cases." *Id.* at 1864. "Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a

new one," the *Abbasi* Court suggested that meaningful differences could include "the rank of the officers involved"; "the generality or specificity of the official action"; "the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted"; "the statutory or other legal mandate under which the officer was operating"; and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Id.* at 1859–60. The Court left no doubt that even small differences constitute a new context—"even a modest extension is still an extension." *Id.* at 1864.

If the asserted cause of action arises in a new context, courts must then consider whether "special factors" counsel against creating a damages remedy absent "affirmative action by Congress." *Id.* at 1857. As clarified by *Abbasi*, this "inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857–58. A *Bivens* remedy should not be implied if "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong." *Id.* at 1858. *See also Hernandez v. Mesa*, 140 S.

Ct. 735, 743 (2020) ("[I]f we have reason to pause before applying *Bivens* in a new context or to a new class of defendants[,] we reject the request."). Relatedly, "if there is an alternative remedial structure present in a certain case," that existing process "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858.

## B. *Stanard's claims present new* Bivens *contexts*

The district court's determination that both of Stanard's *Bivens* claims arose in a new context is consistent with, and indeed compelled by, the Supreme Court's present-day *Bivens* jurisprudence as well as this Court's recent decision in *Hoffman v. Preston*, 26 F.4th 1059 (9th Cir. 2022).

### 1. *Stanard's Eighth Amendment claim rests on different factual circumstances than* Carlson *and implicates prison medical policy rather than treatment decisions that were deliberately indifferent to the plaintiff individually*

#### a. *Stanard's claim is unlike* Carlson

Stanard's HCV-treatment-policy claim is quite different from *Carlson*, the only Supreme Court case recognizing a *Bivens* claim under the Eighth Amendment or in the prison context. *Carlson* involved a

federal inmate with a "serious[]" and "chronic asthmatic condition." 446 U.S. at 16 n.1. BOP officials knew about the inmate's condition yet confined him at a federal detention center contrary to the "advice of doctors," and despite "being fully apprised of the gross inadequacy" of the center's medical facilities. *Id.* When the inmate suffered an asthma attack, officials "failed to give him competent medical attention," "administered contra-indicated drugs which made his attack more severe," exacerbated his condition with a "respirator known to be inoperative," and "delayed for too long a time his transfer to an outside hospital." *Id.* The Supreme Court recognized an implied Eighth Amendment damages claim for this "failure to provide medical treatment" that resulted in the inmate's death. *Abbasi*, 137 S. Ct. at 1859 (explaining *Carlson*'s holding).

By contrast, Stanard challenges prison officials' adherence to then-applicable BOP Clinical Guidance under which he was required to wait to be transferred post-sentencing to begin HCV treatment with a particular class of medications. Stanard has not alleged individual medical treatment decisions "so clearly inadequate as to amount to a refusal to provide essential care, so inappropriate as to evidence

intentional maltreatment causing death." *Green v. Carlson*, 581 F.2d 669, 675 (7th Cir. 1978). Rather, Stanard alleged that the defendants relied on criteria set by BOP policy to deny him the treatment he wanted on the schedule he preferred—treatment that he acknowledges he received once he was designated to FCI Sheridan.

Despite these differences, Stanard argues that his case "arises in the same context" as *Carlson* because it alleges deliberate indifference to serious medical needs in a prison. Appellant's Op. Br. at 26. But the new-context inquiry under *Abbasi* is not satisfied simply because "the right and the mechanism of the injury" may be the same. *Abbasi*, 137 S. Ct. at 1859. *See also Hernandez*, 140 S. Ct. at 743 (a claim can arise in a new context "even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized"). Viewing Stanard's allegations at such a high level of generality ignores the searching inquiry the Supreme Court has now repeatedly explained is required. Under *Abbasi* and *Hernandez*, a court must examine the specific claims brought. The Eighth Amendment claim here does not fit within the boundaries of *Carlson*.

b.   *Stanard has shifted his argument on appeal*

Perhaps recognizing that his policy-based claims do not fit within the boundaries of *Carlson*, Stanard attempts to recharacterize them on appeal. In his amended complaint, Stanard repeatedly alleged that prison officials were following BOP Clinical Guidance when they told him he did not yet qualify for treatment based on his APRI score and holdover status. *See* ER-122–24, 128–29, 134. Stanard now argues that he is "challenging actions that were *not* in accordance with then-existing policy." Appellant's Op. Br. at 33 (emphasis added); *see also id.* at 34 (officials were "acting inconsistently with the policy in practice").

As an initial matter, what the Clinical Guidance required under these circumstances is a separate question from what the Constitution requires—even if Stanard could show a violation of policy, that alone would not necessarily show that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. And simply recharacterizing his claims as stemming from a failure to follow BOP Clinical Guidance does not bring Stanard's case within the boundaries of *Carlson*.

In any event, Stanard's new argument on appeal is not only in direct opposition to what he said in the district court, it is also difficult to square with the facts he alleged. Specifically, on appeal Stanard asserts that BOP's HCV Clinical Guidance requires that all treatment decisions be made on an individual basis. His argument, so far as it goes, is that prison officials did not conduct an "individualized analysis" in his case, instead relying on "default categories," and were thus *not* following BOP policy when they decided he did not yet qualify for the treatment he requested. *Id.* at 32. But Stanard's own allegations show the treatment decisions in his case *were* made on an individual basis: they were based on his APRI score, medical records, and lack of other criteria making him a Level 1 or 2 treatment priority.

For instance, Stanard stated in his BP-8, attached as an exhibit to his original complaint, that in April 2018, Dr. Dy told him he was not qualified for HCV treatment based on his recent lab test result. ER-175. Mrs. McDermont also mentioned Stanard's APRI score when explaining why he could not yet receive his desired treatment. ER-127. Warden Sproul specifically referenced Stanard's "Health Services records," which indicated he was "currently a treatment Priority Level 3 and a pre-trial

inmate." ER-180. And Ian Connors told Stanard that his medical records showed "no clinical indication of advanced fibrosis" and that his APRI score of "less than 2.0 and 1.0" meant he was "not at highest risk for progression of liver disease" and did "not meet priority 1 or 2 treatment criteria at this time." ER-192. *All* these responses were based on the individualized testing and medical assessments Stanard received in BOP custody, the results of which showed that he did not present a compelling or urgent need for treatment under then-applicable BOP policy.

Stanard may disagree with the treatment decisions in his case, but his own allegations show they were made in accordance with BOP's HCV Clinical Guidance after individual evaluation of his condition. At bottom, Stanard's claim is that prison officials adhered to policy in determining he did not yet meet BOP's clinical requirements for the kind of treatment he wanted. That is categorically different from *Carlson*, where prison officials ignored medical advice, left an inmate unmonitored during a life-threatening asthma attack, administered contraindicated medication, and used broken equipment—all of which resulted in the inmate's death. Stanard tries on appeal to equate his case with *Carlson* but, as the

district court correctly recognized, there is a "substantial difference in the factual context of the two cases." ER-47.

And the factual difference is meaningful. This Court recently reaffirmed that an Eighth Amendment claim "arises in a new context" when "it is different in a modest way" from *Carlson*. *Hoffman v. Preston*, 26 F.4th 1059, 1065 (9th Cir. 2022). *Hoffman* teaches that it is not enough when conducting the new-context inquiry that a prisoner alleges "serious harm" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* Instead, a "factually different Eighth Amendment claim than *Carlson*" presents "a new *Bivens* context." *Id.*

### c. *Stanard's allegations are also meaningfully different from the other cases he cites*

Stanard's allegations not only meaningfully differ from *Carlson*, but also from the other Ninth Circuit cases on which he relies. In *Gillespie v. Civiletti* (a case decided during the since-repudiated "*ancien regime*" from which *Bivens* arose), this Court held that an inmate's Eighth Amendment claims against two United States marshals survived a motion to dismiss. 629 F.2d 637, 642 (9th Cir. 1980). The facts alleged in *Gillespie* included that the marshals had, over the course of a trip lasting two-and-a-half months, prevented the inmate from changing his

clothes or showering; deprived him of all washroom items and toiletries; withheld *all* medical care; ignored his request to be moved from a holding cell where other prisoners had threatened his life—and where he later was beaten and sexually assaulted; and left him in an isolation cell where temperatures fell to near-freezing overnight. *Id.* at 639. The inmate alleged that because of this treatment, he "developed a severe skin disease, mental depression, abnormal emotional behavior, and severe emotional distress." *Id.*

These facts are meaningfully different from Stanard's allegations; they happened during cross-country transport, they involved marshals rather than BOP employees and officials, they resulted in severe and obvious harm, and it is hard to conceive how the marshals' actions complied with any Marshals Service policies. Even assuming this Court would still conclude, post-*Abbasi*, that claims such as those alleged in *Gillespie* arise in the same context as *Carlson*, those claims surely do not support recognizing Stanard's policy-based claims here.

*McRae v. Dikran*, an unpublished decision pre-dating *Hernandez*, is also meaningfully different from Stanard's case and does not support his position. 776 F. App'x 412 (9th Cir. 2019). The plaintiff in *McRae*

alleged that BOP healthcare providers operated on his back without his consent.[7] *Id.* at 413. Whatever else *McRae* stands for (and as an unpublished disposition it stands for little), it does not support Stanard's argument that BOP officials implementing treatment priorities in compliance with applicable BOP Clinical Guidance should be held individually liable for damages under the Eighth Amendment.

The two out-of-circuit cases that Stanard relies on (Appellant's Op. Br. at 28), also do not involve claims against prison medical providers who were complying with treatment policy. In *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011), a prison medical director ignored his own opinion and those of three other specialists that "within two years . . . [an inmate with deteriorating vision from abnormal tissue growth on his eyes] required either further evaluation of his vision acuity or surgery," and failed to either monitor the inmate's vision or order surgery. Unlike in *Ortiz*, Stanard's condition was being monitored under the HCV Clinical Guidance, and Stanard does not allege that any healthcare

---

[7] Although the disposition does not explicitly address this point, performing surgery without a patient's informed consent is not in line with the policy of any healthcare practitioner in the United States, let alone with BOP Clinical Guidance.

provider thought he needed to be started on treatment any sooner than he was. In *Koprowski v. Baker*, 822 F.3d 248, 250 (6th Cir. 2016), a case primarily addressing whether an inmate's *Bivens* claim stemming from a workplace injury was supplanted by remedies under the Inmate Accident Compensation Act, there is no indication that prison healthcare providers were adhering to treatment policies when they delayed x-rays and an MRI, denied "access to specialized care, surgery, and ambulatory aids," and "threatened to send [the inmate] to solitary confinement unless he surrendered a wheelchair he had been using."

Stanard points to no case allowing a *Bivens* claim based on allegations that individual prison officials adhered to prison policy in making treatment decisions. Thus, his discussion of the non-exclusive list of "difference" factors in *Abbasi* ultimately misses the point.[8] *See*

---

[8] Stanard is also wrong that there is extensive judicial guidance available for his Eighth Amendment claim. *See* Appellant's Op. Br. at 37. Accepting that this inquiry is "analogous to the question in a qualified immunity analysis of whether the law was 'clearly established' at the time of the" actions in question, *Ioane v. Hodges*, 939 F.3d 945, 952 n.3 (9th Cir. 2018), it is hard to see how Stanard meets this standard given that he has pointed to no case recognizing an Eighth Amendment medical-indifference claim based on adherence to BOP policy. After all, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullinex v. Luna*, 577 U.S. 7, 12 (2015).

Appellant's Op. Br. at 29–30, 37–40. Stanard may have sued the same level of prison officials sued in *Carlson*, under the same constitutional amendment, but his claim is fundamentally different. It is a claim against prison officials who were following a treatment policy with which he disagreed, not a claim against officials who ignored treatment advice, provided inappropriate treatment, or otherwise displayed deliberate indifference to his serious medical needs. The district court correctly concluded that Stanard's Eighth Amendment claim is meaningfully different from *Carlson*.

> 2. *Stanard's Fifth Amendment equal-protection claim is even further afield from* Davis*, and his argument that it derives from the "interplay" between* Davis *and* Carlson *is wrong*

The district court easily concluded that Stanard's Fifth Amendment equal-protection claim arises in a new *Bivens* context. Despite his convoluted argument for why his claim is not new, the Supreme Court has recognized a *Bivens* remedy under the Fifth Amendment only in the context of an employment discrimination claim and never in a prison. *See Abbasi*, 137 S. Ct. at 1859. Allowing a Fifth Amendment claim for alleged

differential medical treatment of a pretrial inmate plainly would be an extension of *Bivens*.

Stanard asserts that his Fifth Amendment claim can be found in the "interplay" between *Carlson* and *Davis*. Appellant's Op. Br. at 54. But the Supreme Court's holdings in those cases—and the Seventh Circuit opinion in *Carlson*—do not support his argument.

        a.    Carlson *does not support Stanard's Fifth Amendment claim*

As Stanard notes, the plaintiff in *Carlson* alleged an equal-protection claim under the Fifth Amendment as well as an Eighth Amendment deliberate-indifference claim. *See* 581 F.2d at 671. But Stanard is wrong that the Seventh Circuit concluded that "plaintiff could seek *Bivens* relief through both." Appellant's Op. Br. at 55. The Seventh Circuit only ruled on the Eighth Amendment claim, citing to *Estelle v. Gamble. See Carlson*, 581 F.2d at 672, 675.

The Supreme Court likewise did not decide whether the plaintiff in *Carlson* could bring a Fifth Amendment *Bivens* claim. Indeed, the only question on which the Supreme Court granted certiorari was "[w]hether the Eighth Amendment gives rise to an implied cause of action in circumstances in which the Federal Tort Claims Act [FTCA] provides an

adequate federal remedy" and whether, if the Eighth Amendment creates such a right, survival of the action is governed by federal or state law. Brief for the Petitioners, *Carlson v. Green*, 446 U.S. 14 (1980), 1979 WL 213535, at \*2. Stanard argues that the Department of Justice must have considered the Seventh Circuit's "equal protection ruling . . . so uncontroversial that [it] did not even challenge it when appealing to the Supreme Court." Appellant's Op. Br. at 56. But the Seventh Circuit never passed upon the Fifth Amendment claim, so there was no "equal protection ruling" for the government to ask the Supreme Court to review.

In its opinion, the Supreme Court noted that the plaintiff in *Carlson* had alleged an Eighth Amendment deliberate-indifference claim and had also alleged that the defendants' indifference "was in part attributable to racial prejudice." 446 U.S. at 16 n.1. But the Court said nothing further about the Fifth Amendment claim, explaining that the courts below had concluded that the plaintiff "pleaded a violation of the Eighth Amendment's proscription against infliction of cruel and unusual punishment, giving rise to a cause of action for damages under *Bivens*." *Id.* at 17 (footnote omitted). The Court then analyzed whether the FTCA

preempted a *Bivens* remedy for the Eighth Amendment violation. *Id.* at 19. It said nothing substantive about the plaintiff's Fifth Amendment claim—and certainly nothing that affirmatively suggested such a claim could go forward under *Bivens*.

Nor can Stanard rely on statements in the parties' briefs to the Supreme Court. In arguing that "relief should not be limited to the remedy available under the FTCA," the plaintiff pointed out that the complaint included a Fifth Amendment equal-protection claim that "is not in any way covered by the [FTCA]." Brief for the Respondent, *Carlson v. Green*, 446 U.S. 14 (1980), 1979 WL 213534, at *10–11 & n.4. In its reply, the government explained that the FTCA "encompasses both prison medical malpractice (whatever the motivation) and the intentional torts of correctional officers," therefore "the statute appears to afford a remedy for [the plaintiff's] particular equal protection claim" and a *Bivens* remedy was unnecessary. Reply Brief for the Petitioners, *Carlson v. Green*, 446 U.S. 14 (1980), 1980 WL 371715, at *5 n.4. But the government also pointed out that the Fifth Amendment claim was not before the Court because "the government's petition for a writ of certiorari expressly concerned only the [plaintiff's] Eighth Amendment

claim." *Id.* Thus, whether a *Bivens* remedy sometimes may be appropriate for a constitutional tort that "does not fall within the scope of a federal remedial statute," the Supreme Court was not deciding that question as to the Fifth Amendment claim alleged in *Carlson*. *Id.*

In short, the *Carlson* decisions do not "set[] the table" for Stanard's Fifth Amendment *Bivens* claim. Appellant's Op. Br. at 57. None of the opinions addressed—much less resolved—whether the plaintiff could bring a Fifth Amendment equal-protection claim based on prison medical treatment. And even if *Carlson* had recognized such a claim, Stanard's Fifth Amendment claim still would present a new *Bivens* context given the significant factual differences between his case and *Carlson*. *See supra* at 31–32.

b.    Davis *also does not support Stanard's Fifth Amendment claim*

Stanard's claim is also different from the Fifth Amendment *Bivens* claim recognized in *Davis*. *Davis* involved gender discrimination in employment by a then-Congressman against his female administrative assistant. *Davis v. Passman*, 442 U.S. 228, 230 (1979). Stanard's claim arises in a prison, involves policies governing the delivery of medical treatment to inmates, and does not stem from alleged employment

discrimination. These factual differences are meaningful, notwithstanding that both cases involve alleged Fifth Amendment violations. *See Hernandez*, 140 S. Ct. at 743; *Hoffman*, 26 F.4th at 1065 (a claim "arises in a new context" when "it is different in a modest way" from a previously recognized *Bivens* context).

Stanard tries to make much of a string-citation footnote in *Davis* that references (with no accompanying analysis) the Seventh Circuit's decision in *Carlson*. According to Stanard, "although the Supreme Court did not say it in so many words," it "implicitly recognize[d] that prisoners could proceed with an equal protection claim under a *Bivens* theory" when it "cited favorably to *Carlson* in extending *Bivens* to Fifth Amendment equal protection claims." Appellant's Op. Br. at 59. Whatever weight the *Davis* Court may have placed on the Seventh Circuit's decision in *Carlson*, the Supreme Court's *own* decision in *Carlson* a year later extended the *Bivens* remedy to cover prisoner claims *only* under the Eighth Amendment. Since then, the Court has repeatedly made clear that the sole *Bivens* remedy it has ever recognized in the prison context is the one in *Carlson*: "a claim against prison officials for failure to treat an inmate's asthma." *Abbasi*, 137 S. Ct. at 1860. *See also*

*Hernandez*, 140 S. Ct. at 741. *Abbasi* itself included a Fifth Amendment equal-protection claim brought by detainees, and the Supreme Court concluded that "[t]he Court of Appeals . . . should have held that this was a new *Bivens* context." *Id.* Simply put, *Davis* did not extend *Bivens* to cover Fifth Amendment equal-protection claims brought by prisoners.

Although Stanard argues otherwise, the enumerated *Abbasi* factors also support the district court's conclusion that Stanard's Fifth Amendment claim is new. Besides their obviously different circumstances (an employment decision in Congress versus a medical-treatment decision in a prison), the nature of the official action in each case differs in another important respect: In *Davis*, the Congressman's conduct violated the rules of the House of Representatives, which directed that "Member[s] . . . shall not discharge or refuse to hire any individual . . . because of such individual's race, color, religion, sex, or national origin." 442 U.S. at 243 n.21. Here, by contrast, BOP medical providers and officials *complied* with BOP Clinical Guidance in finding that Stanard did not yet meet the requirements for HCV treatment, both because of his medical status and because the Guidance did not

recommend treatment for long-term, pre-sentence detainees unless they presented "with high priority criteria." SER-55.

The "extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted" also does not cut in Stanard's favor. *Abbasi*, 137 S. Ct. at 1860. No doubt courts are capable of handling equal-protection claims. But the cases Stanard cites do not support his assertion that "there is a wide body of case law" addressing "disparate treatment between those who are classified as pretrial detainees and those that have been sentenced." Appellant's Op. Br. at 61.

Certainly, *Frost v. Agnos* addresses civil rights claims brought by a pretrial detainee. 152 F.3d 1124 (9th Cir. 1998). But that case includes no claim that the detainee experienced disparate treatment because of his pretrial status. *See id.* at 1127–30. The same is true of *Redman v. County of San Diego*, 942 F.2d 1435 (9th Cir. 1991) (en banc), which addressed a deliberate-indifference claim brought by a pretrial inmate but not a disparate-treatment claim. *See also Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1105, 1120–22 (9th Cir. 2003) (case involving Fifth Amendment substantive and procedural due process challenges stemming from delays by the Oregon State Hospital in providing

treatment to "mentally incapacitated persons charged with a crime," but no allegations of disparate treatment based on plaintiffs' pretrial status); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244–45 (1983) (discussing the due process standard of the Fourteenth Amendment in a case about who should pay for the hospital costs of a pretrial detainee that did not include claims of disparate treatment). In fact, Stanard has cited no equal-protection case challenging prison policies that differentiate between pretrial detainees and sentenced inmates, let alone a case in which that difference in status was a factor considered in prioritizing certain medical treatments.

Finally, Stanard's assertion that there is minimal risk of disruptive intrusion by the Judiciary into the functioning of prisons rests on the assumption that his case concerns only "the individual acts of individual officers." Appellant's Op. Br. at 61–62. First, as the government has explained, *see supra*, Stanard alleged that prison officials adhered to policy in determining he did not yet meet BOP's clinical requirements for HCV treatment. Such policy-based claims inherently implicate the functioning of prisons. Second, most—if not all—*Bivens* litigation is in some real sense about "the individual acts of individual officers" because,

as stated in *Ashcroft v. Iqbal*, a government officer is liable for only his or her individual actions. 556 U.S. at 676. Stanard's argument is thus not a useful basis for distinction. Third, a premise of *Abbasi* is that the prospect of tort liability may generate systemic costs to government operations and that is why Congress, not the courts, should decide whether to impose it. *See* 137 S. Ct. at 1856. For this reason as well, the assertion that this case involves only the individual acts of individual officers sheds no light on whether to extend *Bivens*.

In sum, and as the district court correctly concluded, the Supreme Court has never recognized a *Bivens* remedy under the Fifth Amendment in the prison context. Stanard's Fifth Amendment claim is meaningfully different from *Davis*, from *Carlson*, and from Stanard's strained combination of the two. Accordingly, because both of Stanard's claims arise in a new *Bivens* context, a special factors analysis is required. *See Abbasi*, 137 S. Ct. at 1860.

## C. *Alternative remedies and other special factors counsel against extending a* Bivens *remedy to Stanard's claims*

The Supreme Court's decisions make clear that multiple special factors counsel against expanding the *Bivens* remedy to Stanard's claims.

The special-factors inquiry turns on "whether congressionally uninvited intrusion is [an] inappropriate action for the Judiciary to take." *Abbasi*, 137 S. Ct. at 1862 (quotation marks omitted). No *Bivens* remedy should be inferred if "Congress' failure to provide a damages remedy *might* be more than mere oversight, and that congressional silence *might* be more than 'inadvertent'." *Id.* (emphasis added) (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)).

### 1. Stanard had alternative methods to pursue his desired treatment

"[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not." *Abbasi*, 137 S. Ct. at 1863. The presence of "alternative, existing process[es]" for challenging allegedly unconstitutional action may "alone" foreclose the extension of *Bivens* to new contexts. *Id.* at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

The "alternative remedial structure" referenced by the Supreme Court in *Abbasi* includes both judicial remedies and administrative processes. *See Malesko*, 534 U.S. at 74 ("Inmates in respondent's position also have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed

through the BOP's Administrative Remedy Program[.]"); *Vega*, 881 F.3d at 1154 ("'Alternative remedial structures' can take many forms, including administrative, statutory, equitable, and state law remedies."). Indeed, the "remedy" need not be a cause of action at all; it may be a "process," *Wilkie*, 551 U.S. at 550 (indicating that an "alternative, existing process" would be a reason not to create a *Bivens* remedy), or a "safeguard," *Chilicky*, 487 U.S. at 425 (referring to "meaningful safeguards *or* remedies for the rights of persons") (emphasis added). It is enough for these purposes that the remedial structure provides an "avenue for *some* redress." *Malesko*, 534 U.S. at 69 (emphasis added).

This Court thus noted in *Vega* that the inmate plaintiff there "had a remedy 'to seek formal review of an issue relating to any aspect of his . . . own confinement' under the Administrative Remedy Program." *Vega*, 881 F.3d at 1154 (emphasis and ellipsis in original) (quoting 28 C.F.R. § 542.10(a)). The Administrative Remedy Program provides a "means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring." *Malesko*, 534 U.S. at 74.

That same administrative grievance process was available to Stanard in this case—in fact, he employed it and ultimately received the treatment he requested. The district court therefore correctly concluded that the availability of the BOP's administrative grievance process meant that "a *Bivens* remedy should not be extended to [Stanard]'s Fifth and Eighth Amendment claims." ER-49; *see also id.* at 48 (Stanard "had remedies available to him under the BOP's administrative remedy program which he did, in fact, utilize in an effort to resolve his claims").

In addition, Stanard could have sought declaratory or injunctive relief in federal court. *See* 18 U.S.C. § 3626(a) (prospective relief for prison conditions in violation of federal right); *see also Abbasi*, 137 S. Ct. at 1865 (relevant alternative remedies may include a writ of habeas corpus, an injunction, or some other form of equitable relief). In fact, this Court—relying on *Malesko*, 534 U.S. at 74—recently explained in *Hoffman* that "when the relief sought affects important aspects of prison management . . . the plaintiff should seek an injunction." 26 F.4th at 1068. Unlike in *Bivens*, *Carlson*, and *Davis*, this is not a case in which the choice for Stanard was "damages or nothing." *Bivens*, 403 U.S. at 410 (Harlan, J., concurring). Stanard could have benefited from injunctive

relief, he simply did not seek it. That is not a reason to extend a new *Bivens* remedy.

Stanard might also have been able to challenge BOP's Clinical Guidance under the Administrative Procedure Act. *Cf. Reeb v. Thomas*, 636 F.3d 1224, 1228 n.5 (9th Cir. 2011); *see also W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) (concluding "that the APA leaves no room for *Bivens* claims based on agency action or inaction"). And Stanard could have sought damages from the United States under the FTCA. Relying on *Carlson*, Stanard argues that the FTCA does not displace *Bivens* suits and is not an adequate remedy. *See* Appellant's Op. Br. at 45–47. But as *Abbasi* makes clear, the sole inquiry is whether "alternative methods of relief are available"—which, notably, need not include a damages remedy at all—to protect plaintiffs' interests. 137 S. Ct. at 1863. Even accepting, as this Court stated in *Hoffman*, 26 F.4th at 1068, that the availability of a remedy under the FTCA does not completely *foreclose* a parallel *Bivens* suit, this Court still may consider it as one among several alternative methods of relief that "may limit the power of the Judiciary to infer a new *Bivens* cause of action," *Abbasi*, 137 S. Ct. at 1858.

As the district court concluded, the alternative remedies available to Stanard are sufficient reason not to expand *Bivens* even absent consideration of the other special factors counseling hesitation here. *See* ER-48; *see also Vega*, 881 F.3d at 1153 ("Here, Vega had adequate alternative remedies at his disposal and we therefore decline to address whether any special factors counsel hesitation."). Should this Court choose to address the other special factors, however, they provide additional compelling reasons not to infer new *Bivens* causes of action in this case.

> 2. *Other special factors counsel hesitation, including Congress's delegation of authority to BOP to care for inmates and its refusal to create a damages remedy for cases like this one*

The special factors inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857–58; *see also Hernandez*, 140 S. Ct. at 743. Accordingly, if there are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts

must refrain from creating the remedy in order to respect the role of Congress." *Abbasi*, 137 S. Ct. at 1858. There are reasons to conclude that Congress might doubt the efficacy or necessity of a *Bivens* remedy for Stanard's claims even if there were no alternative remedies.

a. *The Court should not unduly intrude into prison administration*

"Running a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). Allowing inmates to sue prison officials in their individual capacities for applying BOP Clinical Guidance according to its terms would make running a prison considerably harder. That counsels hesitation in this case.

"Prison administration is . . . a task that has been committed to the responsibility of [the executive branch], and separation of powers concerns counsel a policy of judicial restraint." *Id.* at 85; *see also* 18 U.S.C. § 4042(a)(2) (delegating broad authority to the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States"). Deferring to BOP's expertise is especially important here, where Stanard's claims involve not only prison administration but the provision of medical care in an

arena where, as BOP explained, "recommendations for the management of Hepatitis C (in and outside the prison setting) continue to undergo rapid change in order to incorporate the best clinical evidence available." ER-185.

BOP's Clinical Guidance "provides the most current BOP recommendations for the treatment of chronic HCV infection in the federal inmate population." SER-47. Stanard's claims implicate that guidance. *See, e.g.*, ER-122 (alleging Dr. Dy "relied upon Bureau policy and set criteria to deny treatment").[9] Extending a *Bivens* remedy here risks establishing the federal courts as "virtually continuing monitors of the wisdom and soundness of" BOP's policies governing inmate medical treatment. *Cf. Laird v. Tatum*, 408 U.S. 1, 15 (1972). Particularly under the clarified framework set forth in *Abbasi*, it is improbable that "Congress would want the Judiciary to entertain a damages suit" brought

---

[9] Stanard asserts his claims do "not require an exhaustive investigation into BOP operations, but a particularized inquiry into the individual Defendants who failed to adhere to their legal responsibilities." Appellant's Op. Br. at 51. But his own allegations show his requests for treatment were denied in accordance with then-applicable BOP policy based on the results of the individualized testing and medical assessments he received at FDC SeaTac. *See supra* at 34–35.

to litigate the validity of any number of programmatic and implementation decisions regarding BOP's provision of medical services. *See Abbasi*, 137 S. Ct. at 1858.

Stanard argues that because the HCV Clinical Guidance has already been updated, even if he "were to prevail on the merits, there is unlikely to be any significant increase in liability going forward." Appellant's Op. Br. at 51. He is mistaken. Allowing claims like Stanard's would mean that BOP officials would have to defend against suits for damages brought by inmates who disagree with any of the myriad recommendations in BOP's 45 current Clinical Guidance documents to manage their specific medical conditions.[10] The *Hoffman* Court recognized a similar concern when it allowed an Eighth Amendment claim to go forward only after concluding that it did not involve "prison administration or policies." 26 F.4th at 1072; *see also id.* (noting separation-of-powers considerations when deliberate-indifference claims allege harm resulting from "broader prison policies and administration, or when a *Bivens* remedy might lead to the alteration of prison policies

---

[10] All of BOP's current Clinical Guidance is available at https://www.bop.gov/resources/health_care_mngmt.jsp.

and administration"). *Cf. Reid v. United States*, 825 F. App'x 442, 445 (9th Cir. 2020) (special factors did not counsel against a conditions-of-confinement claim because it involved "individualized injuries and fears of retaliation unique to" the inmate and thus "would not result in inappropriate judicial intrusion into [BOP] policy").

Relatedly, "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'" *Abbasi*, 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 74). *Bivens* "is concerned solely with deterring the unconstitutional acts of individual officers," and is not meant to "deter[] the conduct of a policymaking entity." *Malesko*, 534 U.S. at 71. Again, this Court recently said as much in *Hoffman*, explaining that "damages are appropriate" when the relief sought "does not implicate prison policy or management"—otherwise, "the plaintiff should seek an injunction." 26 F.4th at 1068.

Stanard's claims challenging the treatment decisions in his case are, at their core, attacks on BOP policy and the decision-making chain of multiple BOP officials. Indeed, his allegations extend seemingly to every BOP employee, higher-level and lower-level alike, with any relationship to the allegedly indifferent or discriminatory treatment

decisions in his case. But the fact that federal employees implement and execute BOP's regulations, program statements, and clinical guidance does not make a *Bivens* suit the proper vehicle for Stanard's policy-based medical treatment and discrimination claims. *See, e.g.*, *Zavala v. Rios*, 721 F. App'x 720, 721 (9th Cir.), *cert. denied*, 139 S. Ct. 464 (2018) (rejecting challenge to prison-wide mail policy brought against individual employees).

b.   *Congress has refused to create a damages remedy for cases like Stanard's*

"[L]egislative action suggesting that Congress does not want a damages remedy" is another "factor counseling hesitation." *Abbasi*, 137 S. Ct. at 1865. For nearly forty years, Congress has evinced "frequent and intense" interest, *id.* at 1862, in the regulation of federal prisons and in the remedies available to federal prisoners. Although Congress long ago created a cause of action for damages against state officials for constitutional violations, *see* 42 U.S.C. § 1983, Congress has never created a parallel action against federal officials generally or BOP officials specifically. There are reasons to believe this omission "might be more than mere oversight." *Abbasi*, 137 S. Ct. at 1862.

In 1995, Congress enacted the Prison Litigation Reform Act to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Congress designed the PLRA's provisions to "bring . . . under control" the "sharp rise in prisoner litigation in the federal courts," *Woodford v. Ngo*, 548 U.S. 81, 84 (2006), and to "oust the federal judiciary from day-to-day prison management," *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997).

The PLRA "made comprehensive changes to the way prisoner abuse claims must be brought in federal court," *Abbasi*, 137 S. Ct. at 1865, including claims brought by federal prisoners. *See Porter*, 534 U.S. at 524 (holding that the PLRA's "mandatory" requirement that prisoners exhaust all "administrative remedies" before bringing an "action . . . with respect to prison conditions," extends to "federal prisoners suing under *Bivens*"). When Congress enacted the PLRA, it "had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs," and yet, the PLRA "itself does not provide for a standalone damages remedy against federal jailers" for such wrongs. *Abbasi*, 137 S. Ct. at 1865. Rather, the PLRA was enacted to establish certain procedural requirements for actions that already existed under

some independent authority. As the *Abbasi* Court noted, it thus "could be argued" that Congress's failure to provide a damages remedy under the PLRA "suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment" outside that specific context.

Congress's refusal to create a cause of action against BOP officials is consistent with its expressed desire "to eliminate unwarranted federal-court interference with the administration of prisons" by "'affor[ding] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Woodford*, 548 U.S. at 93 (quoting *Porter*, 534 U.S. at 525). Because this "congressional silence might be more than inadvertent," courts should not infer Stanard's requested causes of action absent "affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1862 (quotation marks omitted); *see also id.* (noting Congress's silence on damages remedies "is relevant; and here that silence is telling").

The *Hoffman* Court found this argument "unpersuasive." 26 F.4th at 1070. But *Hoffman* did not involve the "broader prison policies and administration" implicated in this case. *Id.* at 1072. The PLRA warrants

more consideration here because Stanard's policy-based claims risk "interference with the administration of prisons." *Woodford*, 548 U.S. at 93. Further, challenges to prison policies are the kinds of challenges that administrative remedies, which the PLRA requires be exhausted, are well-tailored to address, therefore *Bivens* relief is less needed. There are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" in a suit like this one and this Court therefore should not extend a *Bivens* remedy here. *Abbasi*, 137 S. Ct. at 1858.

For all of these reasons, the district court correctly dismissed Stanard's Fifth and Eighth Amendment claims. Amendment would be futile because "no amendment would allow the complaint to withstand dismissal as a matter of law," therefore the district court was right to dismiss Stanard's complaint with prejudice. *Kroessler v. CVS Health Corp.*, 977 F.3d 803, 815 (9th Cir. 2020).

## II. Stanard failed to plausibly allege claims for Eighth Amendment deliberate-indifference and Fifth Amendment equal-protection violations

Even if the Court concludes that Stanard's Fifth and Eighth Amendment claims do not arise in a new *Bivens* context and that no special factors counsel hesitation, the Court still should affirm the

district court's order dismissing the suit. As the district court found, Stanard failed to allege a plausible claim for relief under the Eighth Amendment. ER-49. And although the district court did not reach the issue, Stanard also failed to allege sufficient facts to state a claim for relief under the Fifth Amendment. *See Vega v. United States*, 881 F.3d 1146, 1152 (9th Cir. 2018) (the Court may affirm a dismissal on any proper ground supported by the record).

To state an Eighth Amendment claim, Stanard had to allege facts that plausibly suggest that the defendants were "deliberately indifferent" to his "serious medical needs." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). "This includes both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Id.* (internal quotation marks and citation omitted).

Stanard has not alleged a deprivation objectively "serious enough" to constitute cruel and unusual punishment. He alleged only that he suffered transient bloating, pain, and fatigue, and he acknowledges that his HCV is now cured. ER-134, 137, 183. Those allegations are not sufficiently serious to suggest a violation of the Eighth Amendment.

He also has not alleged facts from which the Court can reasonably infer that the defendants knew of and disregarded an excessive risk to his health. *Id.* Rather, the amended complaint alleged that each defendant explicitly relied on the BOP's HCV Clinical Guidance in denying Stanard's administrative requests. The defendants compared Stanard's test results and medical records to the Clinical Guidance to determine whether he qualified for treatment. By doing so, they behaved as any reasonable BOP medical provider or official would; certainly, they did not choose a course of treatment "medically unacceptable under the circumstances" in conscious disregard of an excessive risk to Stanard. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016). At most, Stanard may have alleged a difference of medical opinion, but that "cannot support a claim of deliberate indifference." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

Stanard objects to the district court's statement that he failed "to state a cognizable" Eighth Amendment claim for relief. Appellant's Op. Br. at 52 (quoting ER-49). Stanard's argument here is a red herring. First, *Estelle v. Gamble* itself used the word "cognizable" when it dismissed an inmate's Eighth Amendment complaint for failure to state

a claim. 429 U.S. at 106 ("Against this backdrop, we now consider whether respondent's complaint states a cognizable § 1983 claim."). Second, it is plain from the rest of the district court's analysis of Stanard's allegations that it applied the *Iqbal/Twombly* plausibility standard (not least because the two sentences immediately following the one Stanard points to directly quote *Iqbal* and *Twombly*). *See* ER-49; *see also* ER-50–51 (explaining that Stanard alleged "no facts in his amended complaint from which the Court could reasonably infer that Defendants violated his Eighth Amendment rights" and describing his allegations of harm as "vague and conclusory at best").

Stanard likewise failed to state a claim for a Fifth Amendment equal-protection violation. Stanard has not alleged he was treated differently from others similarly situated based on his membership in a protected class, nor a classification that implicates fundamental rights. Rather, he alleged he was denied HCV treatment under a policy that treats inmates in holdover status differently than sentenced inmates. "Classifications that do not implicate fundamental rights or a suspect class are permissible so long as they are 'rationally related to a legitimate state interest.'" *United States v. Padilla-Diaz*, 862 F.3d 856, 862 (9th Cir.

2017) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). And Stanard has put forward no facts showing that any of the individual defendants acted irrationally here or that their denials of his treatment requests in consideration of the Clinical Guidance lacked a legitimate penological interest.[11] For all these reasons, this Court can affirm the judgment on the ground that Stanard has failed to state a claim under either the Eighth or the Fifth Amendment.

## CONCLUSION

Stanard's claims arise in a new context and alternative available remedies and other special factors counsel against extending a *Bivens* remedy in this case. This Court should affirm the district court's decision dismissing Stanard's claims.

---

[11] Any such allegations would be implausible on their face given that the response to Stanard's BP-10, attached to his complaint, explains that BOP's priority criteria for HCV treatment exist to "ensure that those with the greatest need are identified and treated first." ER-185; *see also* SER-17 (BOP's January 2018 HCV Clinical Guidance stating the same). Delivering specific medical treatments to inmates most in need of them is surely a legitimate interest.

May 18, 2022

Respectfully submitted,

NICHOLAS W. BROWN
United States Attorney

*s/ Tania M. Culbertson*
TANIA M. CULBERTSON
Assistant United States Attorney
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(205) 553-7970

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1,

I certify that the foregoing brief is proportionally spaced, has a Century

Schoolbook typeface of 14 points, and contains 13,085 words.

May 18, 2022

*s/ Tania M. Culbertson*
TANIA M. CULBERTSON
Assistant United States Attorney
Western District of Washington

## STATEMENT OF RELATED CASES

To the best of appellee counsel's knowledge, there are not related cases pending before this Court.